STATE *v*. WALTER A. MALMQUIST.

May Term, 1944.

Present: MOULTON, C. J., BUTTLES, STURTEVANT and JEFFORDS, JJ., and CLEARY, Supr. J.

Opinion filed October 3, 1944.

Opinion on Motion for Reargument filed January 2, 1945.

*Alban J. Parker,* Attorney General, and *Lawrence C. Jones* and *F. Ray Keyser,* special counsel, for the State.

*George L. Hunt* for the defendant.

MOULTON, C. J.   This is a suit in equity wherein the State of Vermont seeks to enjoin the defendant, the owner of a dam across the outlet of Lake Fairlee in Orange County, from unreasonably and arbitrarily drawing down the waters of the lake by means of the gate and tube in the dam. After hearing the evidence and filing written findings of fact the Chancellor dismissed the bill, and the cause comes before us on the State's exceptions.

The findings disclose that Lake Fairlee is more than two miles in length, covering approximately 1700 acres, and is a body of public boatable water within the meaning of Sec. 63 of the Vermont Constitution. It is very well adapted for the propagation of fish and the production of fish food, the·parts best suited for these purposes being the marginal or shore areas where the spawning beds and acquatic vegetation are situated. From 1932 to 1939, inclusive, the State, through the Fish and Game Department, has stocked the lake with large numbers of black bass adults and fingerlings, bullhead fingerlings and pike perch fry. Since 1900 a number of summer cottages, hotels and recreational camps, and a public camping ground have been erected on or near its shores.

The outlet of the lake is at its southwesterly end and the water flows in a general southwesterly direction to the Ompompanoosuc River which, in turn, empties into the Connecticut. There has been a dam at the outlet in approximately the same location as the present one since before 1797, but the Chancellor is unable to find the height of the original dam.

The defendant purchased the dam on December 31, 1937, and derives his title through a series of conveyances from Eldad Post who deeded the dam and dam site to Aaron Post by warranty deed on August 21, 1798. On November 10, 1797, the General Assembly of this State passed an act which recited that: "Whereas it is necessary to raise the waters in Fairlee Lake, so called in order to supply with water several mills standing on the stream which empties out of said lake and the supplying said mills with a sufficiency of water to be of great public utility, especially to the inhabitants of West Fairlee, Vershire, Strafford, Thetford and Norwich . . . . it is hereby enacted by the General Assembly .of the State of Vermont that liberty be and is. hereby granted to said Aaron Post, his heirs and assigns to erect and keep a dam across the outlet of said lake, so as to raise the waters in said lake two feet upon a level above the rock at the south end of said Post's saw mill dam, which was anciently the bed or bottom of the stream or outlet of said lake." The act also provided for commissioners to assess the damages to the owners of the lands bordering upon the lake "upon the supposition that said lands be perpetually flowed," with a right of recourse to the County Court by any owner thinking himself to be aggrieved by the assessments. No steps were taken to increase the height of the dam until 1831, when in pursu-

ance to the Act of 1797 the water of the lake was raised 18 inches on a level above a point in the bed rock at the southern end of the dam which was anciently the bed or bottom of the outlet. In 1904 or 1905 the height of the dam was again increased but the Chancellor is unable to find to what extent the level of the lake was raised. At about the time this was done the defendant's predecessor in title purchased flowage rights from the owners of property bordering the lake. In 1939, the dam, having become in bad repair, was rebuilt at the expense of the littoral owners, with the consent and under the direction of the defendant. There has been no change in the elevation of the spillway since 1904 or 1905, and there has been a tube three feet in diameter equipped with a gate in the same location in the dam ever since that time..

There are two dams in the Ompompanoosuc River, one known as the Kimball dam, and the other as the Post Mills dam, situated respectively about a quarter of a mile and between one and two miles below the lake. Neither is connected with the dam at the outlet, or with each other, by penstock or sluiceway. Both are the property of the defendant, who owns and operates a bobbin mill and a saw mill at the site of the Post Mills dam.

A saw mill, powered by a water wheel, was at one time located at the dam at the outlet but discontinued operation in 1891, when the business was removed to the Post Mills dam and thereafter the outlet dam was used only for storage purposes. Between 1933 and 1937 the dam was not in use because the mill was shut down. In 1938, 1939 and until November, 1940, the defendant operated his mill by water power and used the water from Lake Fairlee for this purpose. Since November, 1940, he has used a combination kerosene engine and steam power unit, except during a few weeks in September and October, 1941, when his engine was out of repair. At the time of the hearing steam power was being used.

The present dam is constructed of cement and stone, extending approximately north and south, about 183 feet long, including a spillway of 31½ feet some 10 inches lower than the adjacent parts of the dam. The gate house is situated at the northern end and under it there is a tube 3 feet in diameter fitted with a gate. The dam rests upon a ledge of rock which was anciently the bed of the outlet stream. This ledge pitches downward from south to north. The crest of the spillway is 2.14 feet above the highest point of the rock at the southern end of the dam, on the down stream side, and

10.4 feet above the lowest point at the northern end, on the upstream side, which is 1.8 feet below the bottom edge of the tube under the gate house. A part of the rock near the tube was artificially excavated by a former owner of the dam at some time before 1891. Before the erection of any dam, that is, at some undetermined date prior to 1797, the water flowing through the outlet passed over the lowest point in the ledge, which was then situated somewhat northerly from, and beyond, the present dam and the water level of the lake, normally and not in times of drought or high water, was slightly above this lowest point and at least as low as the bottom edge of the tube on the upstream side.

There is no low water mark at Lake Fairlee, but there is a definite water line marking the point where the land growth begins which has been made by the maintenance of the water at the present spillway level, under normal conditions, unaffected by drought or high water since 1904 or 1905. Between 1891 and 1933 the gate in the tube has been occasionally opened and the water drawn down below the spillway level, but never more than 2 or 3 feet. Since he acquired title the defendant has drawn down the water in connection with his business, but to what extent does not appear. Between 1904 or 1905 and 1939 there was considerable leakage in the dam, but this did not cause the water to recede more than 2 or 3 feet. Since the earlier date just mentioned the level has not been more than 3 feet below the crest of the spillway except in 1911, 1939 and 1941. The reason for the recession in 1911 does not appear; in 1939 the repairs to the dam necessitated the reduction of the level to a point about 6 feet below the spillway, as to which no complaint is made; the drawing down of the water during September and October, 1941, is the basis of this proceeding. Since 1907 there has been a normal fluctuation of the water level, not in times of drought or high water, of two or three feet.

In the summer of 1941 the defendant said to members of the Lake Fairlee Association, an organization of the littoral owners, that he was interested only in the sale of his water rights for $20,000, or the freedom to use the water of the lake in his business when and as he pleased. About September 1st of that year he caused the gate in the dam to be opened and to remain open continuously until about November 1st with the result that the water level was lowered to a point about six feet below the crest of the spillway, large areas of mud banks were exposed, a mephitic odor

was generated by the decaying aquatic vegetation, and the littoral owners were impeded in their access to the lake from their cottages and boat houses. This lowering of the water was not reasonably necessary for the operation of the defendant's mill, which was operated by water power only during a part of the time when the gate was left open. Indeed the floor of the flume broke near the wheelpit in the fall of 1941 and the opening of the flume was boarded up.

It is detrimental to the propagation of fish in the lake when the water level is intermittently lowered to a point two feet or more below the crest of the spillway during the spawning season, March 15 to July 15, the marginal or shore areas are exposed, and this results in the destruction of nests, eggs and spawn. At other times of the year a fluctuation of not more than two feet is not harmful, but a permanent reduction in the level to a point two feet or more below the spillway crest would reduce the area of plant growth and expose the rocks which form fish retreats and thus decrease the piscatorial capacity and productivity of the lake. The use of the lake for boating or bathing, and its scenic beauty are not found to be substantially injured by a reduction of two feet in the level, but a lowering to the extent of six feet, or even less, is harmful in these respects.

The first question to be considered is the standing of the State of Vermont as party plaintiff in this suit. The defendant argues that it is acting only as a catspaw for the owners of the lands bordering on the lake, who have no legal interest in the matter because the flowage rights upon their properties have long since been conveyed to the defendant's predecessors in title. But the State has an interest of its own quite apart from that of private individuals, and we treat this cause without regard to any injury that may have been suffered by the littoral owners. Since it is a body of public and boatable water within the meaning of our Constitution (that is, capable of use for "common passage" as a highway, *Trout and Salmon Club* v. *Mather,* 68 Vt 338, 345, 35 A 323; *Boutwells* v. *Champlain Realty Co.,* 89 Vt 80, 87, 94 A 108, Ann Cas 1918 A 726) the bed or soil of the lake is held by the people of the State in their sovereign capacity in trust for the public uses for which it is adapted and the State is required to preserve the water for the common use of all. *Hazen* v. *Perkins,* 92 Vt 414, 419, 105 A 249, 23 ALR 748; *State* v. *Quattropani,* 99 Vt 360, 363, 133 A 352.

Moreover, the State has not only the right but the duty to preserve and increase the supply of fish, which, being *ferae naturae,* are the common property of the public. *State* v. *Theriault,* 70 Vt 617, 622, 41 A 1030, 43 LRA 290, 67 Am St Rep 695; *State* v. *Haskell,* 84 Vt 429, 433-4, 79 A 852, 34 LRANS 286. This has been done, in the present instance, by the stocking of the lake, under the authority of G. L. 5592. In *State* v. *Haskell, supra,* it was held that it is a public right to have migratory fish afforded access to their feeding or spawning grounds which may be regulated and protected by the State, and it is clear that this principle is of equal application where the fish are not migratory but inhabit a single body of water. Lastly, where the drawing down of the water in a boatable lake constitutes a public nuisance, the State may proceed against the responsible party either in equity or by a criminal prosecution. *Hazen* v. *Perkins,* 92 Vt 414, 421, 105 A 249, 23 ALR 748.

It follows that where the water level of such a lake is reduced so that the common right of boating or fishing is impaired, or the food supply of the fish therein diminished, and the propagation of the fish curtailed, a public nuisance is created, and the State may proceed, as plaintiff, in an appropriate manner against the person whose act has produced any or all of these results.

■ The defendant insists that he has not lowered the water below its natural level and therefore has committed no wrongful act. He bases this contention upon the theory that the natural level is that which existed before any dam had been erected across the outlet, which, he claims, is the lowest point in the ledge under the tube. But the maintenance of the lake at its present level since 1904 or 1905 has given to this level, as regards the submerged lands, all the characteristics of a natural lake, the artificial level has become the natural level, and the entire body of water has become subject to the common rights of fishing and navigation and to all other incidents of public water. *Village of Pewaukee* v. *Savoy,* 103 Wis 271, 79 NW 436, 50 LRA 836, 74 Am St Rep 859, 860-1; *Mendota Club* v. *Anderson,* 101 Wis 479, 493, 78 NW 185. This principle is impliedly recognized in *Hazen* v. *Perkins,* 92 Vt 414, 420, 105 A 249, 251, 23 ALR 748, where the Court speaks of the natural level of Lake Morey, "as regulated and controlled by the dam and sluice erected at the outlet."

The defendant contends that the Act of 1797 is unconstitutional, basing his argument upon the statement in *Hazen* v. *Per-*

*kins*, 92 Vt 414, 419, 105 A 249, 23 ALR 748, that the General Assembly cannot grant to private persons for private purposes the right to control the height of the water in a public and boatable lake, or the outflow therefrom, by artificial means, for such a grant would not be consistent with the trust that requires the State to preserve such water for the common and public use of all. His conclusion seems to be that any dam erected by virtue of the act across the outlet is an unlawful structure, and he says that in drawing down the water he was only doing in part what the State was in duty bound to do in order to restore the water level to its ancient condition.

■ However, it is not open to the defendant to question the validity of the Act. For more than a century he and his predecessors in title have enjoyed the privilege conferred by it. In his answer to the bill of complaint in this cause he alleges that he is the legal owner of the water rights and privileges in question together with the dam, and that his use of the water has been for the maintenance and operation of his mill. He claims flowage rights which can have accrued to him only by virtue of the authority of the Act, and also the right either to use the water or to sell the dam. One who has accepted the benefits bestowed by a statute, or who has acquired rights of property necessarily based upon it, may not thereafter attack that statute as unconstitutional. *Brattleboro Retreat* v. *Town of Brattleboro,* 106 Vt 228, 242, 173 A 209 ; *Frost* v. *Corporation Comm. of the State of Oklahoma,* 278 US 515, 527, 49 S Ct 235, 240, 73 L Ed 483 ; *Buck* v. *Kuykendall, State Director of Public Works,* 267 US 307, 316, 45 S Ct 324, 326, 69 L Ed 623, 38 ALR 286 ; *Grand Rapids and Indiana R. Co.* v. *Osborn, Comm'r. of Railroads,* 193 US 17, 29, 24 S Ct 310, 48 L ed 598, 604 ; *Daniels* v. *Tierney,* 102 US 415, 421, 26 L ed 187, 189 ; *Nuckolls* v. *United States,* 76 F2d 357, 360 ; *Vickery* v. *Blair et als, County Comm'rs.,* 134 Ind 554, 32 NE 880, 881 ; *McMahon* v. *Cooney, Governor,* 95 Mont 138, 25 P2d 131, 134 ; *City of St. Louis* v. *St. L. I. M. and S. Ry. Co.,* 248 Mo 10, 154 SW 55, 60 ; *Deverson* v. *Eastern R. R. Co.,* 58 NH 129, 131. "Undoubtedly, men may not take advantage of a law when it suits them, and then attack it when it does not." *Owens* v. *Corporation Comm. of the State of Oklahoma,* 41 F2d 799, 803. For present purposes at least, we treat the Act as constitutional.

It remains to consider whether, upon the facts found, the State is entitled to the injunction it seeks.

The Act of 1797 is to be construed as permitting a reasonable use of the water of the lake. If this were not so, the raising of the water level would be of no benefit in the operation of the mills, for which the intent of the statute was to insure a supply of water.

The question is, what are the limits of a reasonable use under the Act. It is argued on behalf of the State that any use that is not for mill purposes is unreasonable, and with this we agree. Beyond this, the test is not the whim or pleasure of the owner of the dam, but the interest of the public, and a reduction of the water level that is substantially harmful to that dominant interest we hold to be unreasonable and a public nuisance. But we do not regard the fact that the defendant's mill is situated on the Ompampanoosuc River, and not upon the stream which connects the lake with the river as depriving him of all right to use the water impounded by the dam.

While the defendant has drawn the water of the lake upon various occasions since he acquired title to the dam there is no finding as to the extent to which he did so except during September and October, 1941. His conduct at that time was wrongful and an infringement of the rights of the State. It constituted a public nuisance, and, if persisted in, or threatened with repetition, would be a proper subject for injunctive relief. *Hazen* v. *Perkins, supra.* However, it has not been repeated. We have been informed by counsel during argument that since the gate has been closed the water has risen and the lake has reached its former level. If the record showed no more than this, an injunction could not properly be issued, for although equity will interfere to prevent the commission of repeated acts done or threatened, which are wrongful and injurious to the property or rights of another, it will not do so where an act is single and temporary in nature, and, in such a case, it will leave the aggrieved party to pursue his remedy at law, *Murphy* v. *Lincoln,* 63 Vt 270, 280, 22 A 418; *Griffith* v. *Hilliard,* 64 Vt 643, 644, 25 A 427; *Averill* v. *Vermont Valley R. R. Co.,* 88 Vt 293, 298, 92 A 220; *Holton* v. *Hassam,* 94 Vt 324, 328, 111 A 389; *Kennedy* v. *Robinson,* 104 Vt 374, 376, 160 A 170; *Kasuba* v. *Graves,* 109 Vt 191, 199, 194 A 455. But, as we have seen, the defendant told the members of the Fairlee Lake Association that he was interested either in the sale of his water rights for $20,-

000.00 or the liberty to use the water of the lake in his business when and as he pleased. It is conceivable that this statement, taken in the light of his subsequent act in causing the gate to remain open continuously for two months, was indicative of a design to capitalize the nuisance value of his ownership and control of the dam, by compelling the littoral owners, if they would avoid further inconvenience and the depreciation of their properties, to purchase the dam from him at the price of his own choosing, and in this aspect it would not be difficult to construe his language as a threat. It is not necessary, however, to ascribe this particular meaning to what he said and did. The words "liberty to use the water of the lake in his business when and as he pleased" are the expression of an intention, which is the equivalent of a threat, *Kennedy* v. *Robinson,* 104 Vt 374, 376, 160 A 170, to draw down the level without limitation at whatever time or in whatever manner it suited him. This, of course, he cannot do, for his rights are circumscribed by those of the public. His subsequent conduct gives point and meaning to his words.

The findings of fact show that the State is entitled to injunctive relief, but they are not sufficiently definite to indicate the extent to which it should be granted. Any restraining order must necessarily set the limit beyond which the water level cannot be lowered, and this limit must be one that is not detrimental to the rights of the public. The findings state that during the spawning season an intermittent lowering of "two feet or more" below the elevation of the spillway crest is injurious to the propagation of the fish, and that a permanent lowering of "two feet or more" at other times has the same effect, although a fluctuation of the water level at such other times of not more than two feet does no harm. It is obvious that the phrase "two feet or more" shows that a lowering of only two feet is harmful, and that the point of safety must be somewhere short of that, but where it may be is left to speculation. This question must be answered before justice to both parties can be done.

It is proposed on behalf of the State that the customary and usual use of the water during past years which has resulted in a fluctuation of between two and three feet can be taken to be a safe guide to what should be considered to be a reasonable use. But this proposal cannot be accepted, since the findings show that injury occurs at certain times and under certain conditions when the

level is lowered less than two feet, and, that at no time can the reduction be more than two feet. As trustee for the people, the State cannot waive the rights and interests of those who are the beneficiaries of the trust. It cannot consent to an order of court which would leave those rights and interests impaired. Neither can the defendant claim a prescriptive right as against the State, no matter to what extent and for how long the waters have been used by him and his predecessors in title. *Hazen* v. *Perkins,* 92 Vt 414, 420, 105 A 249, 23 ALR 748; P. L. 1674. And as to the normal and seasonal fluctuation in level of two to three feet, it is enough to say that no order of court can control the forces of nature and we are here concerned only with the control of the height of the water by artificial means.

It is not necessary to consider the matter of the navigation of the lake or to determine how far the water can be drawn down without injury to it. This is only one of the public rights involved; the other is in the common property in the fish, which it is the duty of the State to safeguard. Harm to the latter right is caused by a reduction in the water level before the former is affected.

Upon the record before us we are satisfied that the State has a meritorious cause of action, and there must be a remand for further proceedings in order that there may be a final disposition of the controversy.

*Decree reversed, and cause remanded, with directions that further proceedings be had, and the limits to which the level of the water of Lake Fairlee may be drawn down below the elevation of the crest of the spillway in the dam at the outlet of the lake during the spawning season, March 15th to July 15th, and also at other times of the year without detriment to the propagation of fish, or the production of fish food, shall be ascertained, and that when this has been done, an injunction issue restraining the defendant, his agents and servants, from drawing down the water of the lake below such limits, and from drawing down the water for any purpose other than for the operation of his mill. But nothing herein shall be construed as prohibiting either party to this proceeding from applying to the Court of Chancery for permission temporarily to draw down the water to a point below the limits set by the injunction for purposes of necessary repairs to the dam.*

## ON MOTION FOR REARGUMENT

MOULTON, C. J.  The principal fault that the defendant finds with the foregoing opinion relates to the holding that his statement concerning the use of the water constituted a threat. It is strongly urged in his behalf that we have disregarded our rule that findings of fact must be construed to support the decree if reasonably possible; that the Chancellor, having heard the evidence and having considered the circumstances under which the statement was made, must have concluded that it was not a threat and this must be inferred by us in support of the decree; and that we have drawn an inference which the trial court has declined to draw. To sustain this position, defendant's counsel has referred to the transcript, which is claimed to show that the statement was made in the course of an amicable conversation between the defendant and the members of the Lake Fairlee Association under such circumstances that a minatory character could not possibly be attributed to it.

It may be noted that this contention was not given as a ground for reargument in the written motion. But since it was presented on hearing without objection we treat it as having been included by amendment.

██ ██ It is true that doubtful findings are to be construed in support of the decree if this can reasonably be done, *Read* v. *Hendee,* 100 Vt 351, 354, 137 A 329; *Glass* v. *Newport Clothing Co.,* 110 Vt 368, 375, 8 A2d 651; *Hooper* v. *Levin,* 112 Vt 321, 325, 24 A2d 337, and that we must assume, in favor of the decree, that the trial court inferred such facts from the other facts certified as it ought to have done, or might fairly have done. *Labor* v. *Carpenter,* 102 Vt 418, 422, 148 A 867; *Lowe* v. *Green Mountain Power Corporation,* 111 Vt 112, 117, 11 A2d 219; *Wheeler* v. *Taylor,* 114 Vt 33, 39 A2d 190, 192. But we cannot supplement the findings by other facts not fairly inferable as resulting from them. *Manley Bros.* v. *Somers,* 100 Vt 292, 297, 137 A 336; *Wright* v. *Godin,* 108 Vt 23, 26, 182 A 189. And where the trial court has drawn an unwarranted inference from the facts as found such inference is to be disregarded. *Smith* v. *Vermont Marble Co.,* 99 Vt 384, 396, 133 A 355.

██ Moreover, we cannot supply missing facts by an examination of the transcript, for the transcript does not enlarge the findings even though referred to therein, or in the bill of excep-

tions. *Powell* v. *Merrill,* 92 Vt 124, 130, 103 A 259; *Grapes* v. *Rocque,* 96 Vt 286, 290, 119 A 420; *Partridge* v. *Cole,* 98 Vt 373, 376, 127 A 653; *Bardwell* v. *Ins. Co.,* 105 Vt 106, 111, 163 A 633. This rule applies equally to causes at law and in equity. See *Goodenough* v. *McGregor,* 107 Vt 524, 526, 181 A 287.

The findings show that the defendant's assertion was unequivocal. It related to all seasons of the year, and was limited only by his desire. No facts are found that would tend to modify it, and it must be taken in the light of his subsequent conduct. An inference that it was not a threat is unsupported by the other findings, and is unwarranted.

Another ground of the motion is that the statement in the opinion that "at no time can the reduction (of the water level) be more than two feet" without resulting injury is contrary to the finding that outside the spawning season a fluctuation of more than two feet, to some point which the chancellor says he is unable to determine, below the elevation of the spillway crest is not harmful. The passage in the opinion quoted above should be read as having reference to the spawning season.

The defendant urges the futility of a remand for the purpose of fixing a point of harmless reduction in the water level which the chancellor has professed himself as being unable to find. We do not share in this belief. It is important that the rights of the parties shall be determined and it may be confidently expected that upon a further hearing the requisite findings can be made. That we have the power in the exercise of our discretion to remand a cause for further proceedings is well settled. *O'Boyle* v. *Parker-Young Co.,* 95 Vt 58, 63, 112 A 385; *Pennock* v. *Goodrich,* 102 Vt 68, 72, 146 A 1; *Goodenough* v. *McGregor,* 107 Vt 524, 528, 181 A 287; *Vilas* v. *Smith,* 108 Vt 18, 23, 183 A 854.

*Motion for reargument denied. Let full entry go down.*