[No. 39444.    En Banc.    December 4, 1969.]

CHARLES S. WILBOUR et al., *Respondents and Cross-appellants*, v. NORMAN G. GALLAGHER et al., *Appellants*.*

*W. Gordon Kelley* and *Ned W. Kimball*, for appellants.

*Charles W. Cone* and *Engst, Phelps & Young*, for respondents and cross-appellants.

HILL, J.—We are here concerned with the uses to which privately owned land can be put, which for "thirty-five years"[1] has been submerged each year by waters of a na-

*Reported in 462 P.2d 232.

---

[1] "Thirty-five years" is based on the stipulation of the parties and the findings of the trial court. There is evidence that the land has been submerged each year since 1927.

vigable lake. The submergence at its maximum depth (3 to 15 feet)[2] was for approximately 3 months, June 15 to September 15 each year.

The circumstances and history which furnished the background for the presentation of this unusual problem must be explained in some detail.

Lake Chelan is a glacial gorge in Chelan County, approximately 55 miles in length, and with a width, generally speaking, of from 1 to 2 miles. Its navigability is conceded.[3] Prior to 1927, it lay in its natural state with the level of its waters at 1,079 feet above sea level. By 1891 the land involved in this action had passed into private ownership being included in the "Plat of the Town of Lake Park."[4] The platter dedicated and quitclaimed all streets and alleys therein to the use of the public forever. All of the platted property subsequently became a part of the town of Lakeside, and is now a part of the town of Chelan. The date of incorporation of Lakeside does not appear from the record, but on May 2, 1927, by ordinance No. 24, the town vacated certain specifically described streets and alleys.[5] On the same day, the Chelan Electric Company and the Lake Chelan Box Factory, both Washington corporations, as parties of the first part (and apparently the owners of all of the property contiguous to the vacated streets and alleys and who acquired title thereto by vitue of the vacation) executed an instrument (duly recorded) which contained the following recitals and grant:

THAT WHEREAS, the Town of Lakeside did by Ordinance

---

[2]This was at the same time; 3 feet being on the landward side of the property, and the 15 feet on the lakeward side.

[3]Lake Chelan is navigable by any test and there is no necessity to resort to the "contemporary test" referred to by Professor Charles E. Corker, *i.e.*, can it "float a Supreme Court opinion." 45 Cal. L. Rev. 604, 617 (1957).

[4]The plat was recorded June 19, 1891 in the office of the auditor of Okanogan County. The property is now in Chelan County which was formerly a part of Okanogan County.

[5]All of the streets and alleys with which we are here concerned were included in this vacation, and were also included in the grant of access referred to in the next paragraph.

308

passed May 2nd, 1927, and numbered 24, vacate those portions of the streets and alleys hereinafter named, in the Town of Lakeside; and,

WHEREAS, the Chelan Electric Company as a part of its power project, intends to impound the waters of Lake Chelan, and to raise the same to the elevation of 1100 feet, still water measurement, above mean sea level, and to inundate and overflow to said elevation, those portions of the streets and alleys described in said ordinance; and

WHEREAS, the Town of Lakeside, party of the second part, desires, for itself and the public, to have the right of access over the lands and premises included within the boundaries of the portions of said streets and alleys described in said Ordinance, to Lake Chelan, at all stages of water, but not, however, to interfere with the impounding or storage of said waters as stated above, or the flow thereof.

Now, THEREFORE, the parties of the first part, in consideration of One Dollar ($1.00) and other valuable consideration to them in hand paid by the party of the second part, receipt of which is hereby acknowledged, do *convey and quit claim unto the party of the second part, in perpetuity, the right of access, for itself and the public, over the lands included within the boundaries of those portions of the vacated streets and alleys hereinafter described, to Lake Chelan, at all stages of water,* not however, interfering with the right of the first party, Chelan Electric Company, its successors and assigns, to impound the waters of Lake Chelan and *to raise the same to the elevation of 1100 feet, still water measurement above mean sea level, and to inundate and overflow to the said elevation, those portions of the vacated streets and alleys hereinafter described,* or the impounding or storage of the waters of Lake Chelan as stated above, or the flow thereof; those portions of the said vacated streets and alleys, being more particularly described as follows, to-wit:

(Italics ours.) Then followed a listing of exactly the same streets and alleys which had been included in the vacation ordinance.

It should be noted that the public is the beneficiary of the grant in perpetuity of " . . . the right of access . . . over the lands included within the boundaries of

those portions of the vacated streets and alleys hereinafter described, to Lake Chelan, at all stages of water . . ."

The Chelan Electric Company[6] constructed a dam, pursuant to a permit by the Federal Power Commission, which permitted the annual raising of the level of the lake to 1,100 feet above sea level, with the requirement that it reach that level by June 15 each year. Thereafter in May of each year the dam was closed and the waters gradually rose to the 1,100 foot level, presumably by June 15th. They were maintained at that level until September when the dam was opened and the waters gradually subsided to the natural 1,079 foot level.[7]

We come now to a consideration of the right claimed by the defendants, Norman G. Gallagher and Ruth I. Gallagher, his wife, to fill their land below the 1,100 foot level to a height 5 feet above that level, and thus prevent its being submerged and making it available for use at all times. (Certain fills have now been completed.)

The claimed right is challenged by the plaintiffs (Charles S. Wilbour and Harriet G. Wilbour, his wife; and Chester L. Green and Ruby Green, his wife) who brought a class action on behalf of themselves and the public asking that the fills be removed, and asking for damages to their own properties caused by the fills.

To assist in an understanding of the situation, we have prepared a drawing, which appears on the following page. It is not drawn to scale, neither is it an exhibit in the case and it has been prepared for illustrative purposes only. It is based primarily on exhibit 5, a large drawing by Mr. Gallagher showing the fills he has made. It shows also the approximate water line of Lake Chelan at both the 1,079

[6]The Chelan County Public Utility District No. 1 has succeeded to all the rights and interests of the Chelan Electric Company in the dam, and the rights granted by the Federal Power Commission.

[7]There was testimony which indicated that the water never had reached the 1,100 foot level, but that some years it was higher than others. There was evidence, too, that some years the water did not recede all the way to the 1,079 foot level. These variations are not material in our discussion, and we will assume that the water line at these levels represents the high and the low water marks of the lake.

and 1,100 foot levels. The lots, blocks, streets and alleys are as shown in the plat of Lake Park, and State Highway 97 has been superimposed. Unfortunately, the block numbers, other than 2 and 3, were omitted, and they will be supplied in our narrative explanation of the drawing.

A - GALLAGHER FILL, BLOCKS 3 and 6, MAIN and CROSS STREETS
B - GALLAGHER FILL, BLOCKS 2 and 4, CROSS STREET
G - GREEN PROPERTY
W - WILBOUR PROPERTY

The shaded area has been divided into 4 lettered segments. G and W are the properties owned by the plaintiffs (the Greens and the Wilbours), improved with their respective homes, and lying partially above and below the 1,100 foot level[8] (all of block 4, plat of Lake Park). A and B represent the two fills made by the defendants (the Gallaghers), both fills have access to Highway 97, and are now being used as trailer courts.[9] A includes block 3, plat of Lake Park (except lots 1 and 2), including the alley in that block extending from vacated Wharf Street to vacated Main Street; a portion of block 6, plat of Lake Park, between the highway and vacated Main Street; also portions of vacated Main and Cross[10] Streets. B includes a part of block 4, plat of Lake Park between the highway and vacated Cross Street; lots 18 to 22 inclusive, block 2, plat of Lake Park; and the portion of vacated Cross Street lying between the indicated portions of blocks 4 and 2. A portion of the intersection of vacated Cross and Wharf Streets also has been blockaded by a construction of the defendants, not shown on the drawing.

The trial court found that for 35 years prior to the trial (July and September 1965) and except for the filling by the defendants, commenced in 1961, the waters of Lake Chelan

covered the lands of Defendants in Blocks 2 and 3, Lake Park, including the streets and alleys in and adjacent to said Blocks 2 and 3, for a period each year from late spring through September, to a depth of three feet to fifteen feet.

[8]The drawing would indicate that a half or more of the Green and Wilbour properties were below the 1,100 foot line; the evidence is that at its highest the water level impinges but slightly beyond Cross Street. The situation referred to in note 5 may afford a partial explanation of the difference between the actual high water line and the 1,100 foot level as shown on the drawing.

[9]B was in use as a trailer court at the time of the trial; and we gather from statements made in argument, that A is now in use for the same purpose.

[10]The portion of vacated Cross Street included in A is quite small and is right at the intersection of vacated Main with Cross Streets. The unfilled portion of Cross Street, now a shallow moat at high water, affords the Greens their only access by water to the lake.

And that for the same period

the general public, including Plaintiffs and their respective predecessors in interest, have used the waters covering the portions of Blocks 2 and 3, Plat of Lake Park, now owned by the Defendants, as well as the water covering portions of the streets and alleys adjacent thereto, for fishing, boating, swimming and for general recreational use and that said use was open adverse, notorious and uninterrupted for said period, during the period of each year when water covers the said portions of Block 2 and 3 and the adjacent streets and alleys.

The trial court ultimately concluded (based upon estoppel) that the defendants should not be compelled to remove their fills, but awarded the plaintiffs damages, finding that the value of the Wilbour property had been lessened $8,500, and the value of the Green property had been lessened $11,000 by reason of the fills established by the defendants.

The trial court provided in its judgment:

That in the event the remedy of abatement should be determined to apply upon any appeal in this cause, then each Plaintiff should have and recover judgment against Defendants in the sum of $1,800.00 per year from July 1, 1964, to the date of completion of abatement of said fill in its entirety.

This lessening of value was predicated principally on the loss of view, but also on inability to use the water over the filled land for navigation, fishing, swimming, boating and general recreational uses; and because, in consequence of the defendants' fill, "algae has become an increasing problem, which has created an unsightly situation on Plaintiffs' beaches."

From this judgment the defendants appealed, urging that they were simply making their own property usable and that any damages sustained by the plaintiffs were damnum absque injuria.

The plaintiffs have cross-appealed urging that the defendants' fills should have been abated.

The importance of this litigation transcends the consideration it has received from the public authorities. If every

owner of property between the 1,079 foot and the 1,100 foot level around Lake Chelan has the right the defendants claim, the public's right in the navigable waters of that lake above the 1,079 foot level would be practically nil.

The property owners could make any use, not prohibited by law, of their properties—from fills for trailer parks close to the highways to high-rise apartments close to the lake.

Unless the laws applicable to the use of navigable waters apply to this annual artificial extension of the water of Lake Chelan, to preserve the status quo, it would seem that everybody is on his own.

The plaintiffs have made an excellent case on the basis of prescriptive rights. The filling of the vacated streets and alleys by the defendants cannot be sustained on any basis, since they had acquired no title to them and, in any event, the public had the right of access over the lands included within the boundaries of the vacated streets and alleys to Lake Chelan at all stages of water. Further, the obvious purpose of the contemporaneous vacation and the grant to the public of the right of access was to enable the Chelan Electric Company to acquire the right to submerge the streets and alleys and yet to preserve to the public the right of access over them to the lake "at all stages of water."

However, it is unnecessary to rely on prescriptive rights, or on the rights of the public to use the land within the vacated streets and alleys for access to the lake. We prefer to rest our decision on the proposition that the fills made by the defendants constitute an obstruction to navigation.

While this is a matter of first impression and no exactly comparable case has been found, our holding represents the logical extension of established law in somewhat comparable situations.

There was no private ownership of the land under Lake Chelan in its natural state, and no right to obstruct navigation.

It is well settled that if the level of the lake had been raised to the 1,100 foot level and had been maintained

constantly at that level for the prescriptive period, the 1,100 foot level would be considered the natural level of the lake with the submerged lands being converted into part of the lake bed and to state ownership. The public would have the right to use all of the water of the lake up to the 1,100 foot level. *State v. Malmquist,* 114 Vt. 96, 40 A.2d 534 (1944); *Village of Pewaukee v. Savoy,* 103 Wis. 271, 79 N.W. 436 (1899).

We have here, however, not only the raising of the lake level by artificial means, but the distinctive features that the level does not remain constant and that the owners of the land between the 1,079 and the 1,100 foot level can occupy their property during most of the year.[11]

We find a somewhat comparable situation in those navigable lakes which have a natural or seasonal fluctuation in extent, and have a recognized high water line and low water line. However, in those cases the problems involved usually hinge on the rights accorded riparian owners (whose titles go to the low water mark) in the areas between the high and low water marks.

The law is quite clear that where the level of a navigable body of water fluctuates due to natural causes so that a riparian owner's property is submerged part of the year, the public has the right to use all the waters of the navigable lake or stream whether it be at the high water line, the low water line, or in between. *Doemel v. Jantz,* 180 Wis. 225, 193 N.W. 393, 31 A.L.R. 969 (1923); *Diana Shooting Club v. Husting,* 156 Wis. 261, 145 N.W. 816, 1915C Ann.

[11]Title to the defendants' property below the 1,100 foot level is deraigned through deeds which make it subject "to the perpetual right to raise the waters of Lake Chelan, Washington to the elevation of eleven Hundred (1100) feet above mean sea level, and to perpetually inundate and overflow [said property] to said elevation of eleven hundred (1100) feet above mean sea level." We do not inquire as to who can now enforce this right; or whether property owners whose title is subject to similar flowage and inundation rights have any cause for complaint, if other property owners fill their land so that it cannot be overflowed. We merely call attention to this reserved right to indicate that the defendants must have purchased their property with full knowledge of it, and that there can be no limitations as to when the right may be exercised.

Cas. 1148 (1914). In such situations the riparian owners whose lands are periodically submerged are said to have the right to prevent any trespass on their land between the high and the low marks when not submerged. However, title between those lines is qualified by the public right of navigation and the state may prevent any use of it that interferes with that right. *Stewart v. Turney*, 237 N.Y. 117, 142 N.E. 437, 31 A.L.R. 960 (1923). *See* Annot., *Right of public to use shore of inland navigable lakes between high and low water mark,* following *Stewart v. Turney, supra,* and *Doemel v. Jantz, supra,* at 31 A.L.R. 960, 978 (1923). When the land is submerged, the owner has only a qualified fee subject to the right of the public to use the water over the lands consistent with navigational rights, primary and corollary. *Doemel v. Jantz, supra; Diana Shooting Club v. Husting, supra.*

Thus, in the situation of a naturally varying water level, the respective rights of the public and of the owners of the periodically submerged lands are dependent upon the level of the water. As the level rises, the rights of the public to use the water increase since the area of water increases; correspondingly, the rights of the landowners decrease since they cannot use their property in such a manner as to interfere with the expanded public rights. As the level and the area of the water decreases, the rights of the public decrease and the rights of the landowners increase as the waters drain off their land, again giving them the right to exclusive possession until their lands are again submerged. *See, Doemel v. Jantz, supra; Diana Shooting Club v. Husting, supra.*

When the circumstance of an artificial raising of navigable waters to a temporary higher level is synthesized with the law dealing with navigable waters having a naturally fluctuating level, the logically resulting rule for the protection of the public interest is that, where the waters of a navigable body are periodically raised and lowered by artificial means, the artificial fluctuation should be considered the same as a natural fluctuation with the rights of the public being the same in both situations, *i.e.,* the public has

the right to go where the navigable waters go, even though the navigable waters lie over privately owned lands.

As Chief Justice Cassoday of the Wisconsin Supreme Court suggested in *Mendota Club v. Anderson*, 101 Wis. 479, 78 N.W. 185 (1899) at 493:

> Certainly, persons navigating the lake cannot be required or expected to carry with them a chart and compass and measuring lines, to determine whether they are at all times within what were the limits of the lake prior to the construction of the dam.

Following the reasoning of these cases we hold that when the level of Lake Chelan is raised to the 1,100 foot mark (or such level as submerges the defendants' land), that land is subjected to the rights of navigation, together with its incidental rights of fishing, boating, swimming, water skiing, and other related recreational purposes generally regarded as corollary to the right of navigation and the use of public waters. *Nelson v. DeLong*, 213 Minn. 425, 7 N.W.2d 342 (1942).[12] When the level of the lake is lowered so that the defendants' land is no longer submerged, then they are entitled to keep trespassers off their land, and may do with the land as they wish consistent with the right of navigation when it is submerged.

It follows that the defendants' fills, insofar as they obstruct the submergence of the land by navigable waters at or below the 1,100 foot level, must be removed.[13] The court cannot authorize or approve an obstruction to navigation.

---

[12]This case points out that naviable waters may be divided by proper authority into areas for the exclusive use of one or more of these activities. We have made no attempt to elaborate on the uses corollary or incidental to the right of navigation. An early, somewhat alliterative statement included the right to "boat, bathe, fish, fowl, skate and cut ice" on the "great ponds of New Hampshire." *Whitcher v. State*, 87 N.H. 405, 181 A. 549 (1935). They have now been expanded to include water skiing and skin diving. *See Nelson v. DeLong*, 213 Minn. 425, 7 N.W.2d 342 (1942).

[13]We come to this conclusion with some reluctance since there have been other fills in the neighborhood about which there has apparently been no protest.

It is apparent, however, that if the defendants were to prevail in this litigation the whole area around Lake Chelan between the 1,079

We come now to a consideration of the damages awarded by the trial court in the event of an abatement.

We do not affirm as to damages because the award of $1,800 a year for each year from 1964 until the fills are abated seems excessive,[14] and because it was apparently predicated to a considerable extent on the loss of a prescriptive right of view.

Had the lake never been raised, the defendants, in the absence of zoning or building restrictions, might have built a high-rise apartment on block 3 and another on block 2, cutting off the view from the plaintiffs' properties. Even with the annual fluctuation, if it were practicable to do so and assuming that no zoning or building restrictions were violated, the defendants might erect temporary structures on their property each September and remove them each May, effectively cutting off the view of the plaintiffs during that period.

■ The plaintiffs have unquestionably sustained special damages as a result of defendants' wrongful activities, and

and 1,100 feet levels could be dotted with structures on fills, or stilt-like structures raised above the 1,100 foot level, and buildings resting on columns are now not unusual.

We are concerned at the absence of any representation in this action by the Town or County of Chelan, or of the State of Washington, all of whom would seem to have some interest and concern in what, if any, and where, if at all, fills and structures are to be permitted (and under what conditions) between the upper and lower levels of Lake Chelan. There undoubtedly are places on the shore of the lake where developments, such as those of the defendants, would be desirable and appropriate. This presents a problem for the interested public authorities and perhaps could be solved by the establishment of harbor lines in certain areas within which fills could be made, together with carefully planned zoning by appropriate authorities to preserve for the people of this state the lake's navigational and recreational possibilities. Otherwise there exists a new type of privately owned shorelands of little value except as a place to pitch a tent when the lands are not submerged.

[14] The trial court apparently did not realize how slowly the appellate process moves. It would (at best) be 1970 before the fills could be removed. Six times $1,800 would be $10,800 for both the Greens and the Wilbours. They would have their properties with the obstructions removed, and damages equivalent to the amount awarded for the depreciation of the value of their property if the fills had not been abated—slightly more for the Wilbours, slightly less for the Greens.

of a character that sustains their right to maintain this action, *Kemp v. Putnam*, 47 Wn.2d 530, 288 P.2d 837 (1955); *Dawson v. McMillan*, 34 Wash. 269, 75 P. 807 (1904); *Carl v. West Aberdeen Land & Improvement Co.*, 13 Wash. 616, 43 P. 890 (1896). However, we do not agree that there ever was a year-round right of view with which there could be no interference.

We set aside the judgment for damages, and remand with instructions to abate the fills made by the defendants insofar as they interfere with the rights of navigation, primary and corollary, when the water of Lake Chelan stands at any level up to the 1,100 foot level, and with instructions to reappraise such special damages as the plaintiffs may have sustained as a result of the defendants' wrongful interference with their rights of navigation, primary and corollary, and the effects of such wrongful interference upon their property.

FINLEY, ROSELLINI, HAMILTON, HALE, and McGOVERN, JJ., concur.

NEILL, J. (dissenting in part)—Defendants are owners of platted lots which originally abutted on Lake Chelan, a navigable waterway. In 1927, Chelan Electric Company obtained a permit to raise the water of the lake to a level 21 feet above its natural level. This permit was in connection with the construction of a dam for electrical power generation. The power company owned the subject lots at the time thie permit was obtained. Subsequently, it conveyed them subject to its permit rights to seasonally flood the premises.[15]

Accordingly, we are considering the right of defendants as littoral owners to raise the level of the land to create upland out of that which is, by reason of the flowage ease-

---

[15]The record does not disclose whether this was a flowage easement or whether it was more extensive and included the right to seasonally maintain a reservoir on the subject lands. *Cf. Watuppa Reservoir Co. v. Mackenzie*, 132 Mass. 71 (1882), with *Tiffany v. Town of Oyster Bay*, 234 N. Y. 15, 136 N.E. 224, 24 A.L.R.1267, (1922). However, this distinction is important only to the Chelan County PUD, as successor in interest of Chelan Power Company, which is not a party to these proceedings.

ment, seasonally foreshore land. We are not here considering foreshore lands of the natural lake. The distinction is determinative.

Against this asserted right of the defendants is the claim of plaintiffs that, as members of the public, they have the right of navigation, swimming, boating and recreation on the waters of navigable Lake Chelan, including the waters which seasonally submerged defendants' property. Plaintiffs further claim a right of view over defendants' lands. Plaintiffs are not littoral owners as to the natural lake.

The trial court based its judgment for plaintiffs on prescription. The court found that the public had seasonally used the waters overlying defendants' lots for fishing, boating, swimming and general recreational use for some 35 years, and that such use was open, adverse, notorious and uninterrupted for that period. Defendants do not challenge the finding as to the time period. Accordingly, I will assume that the use by the public was uninterrupted and continuous, though seasonal. However, defendants do challenge the finding that the use by the public was adverse.

To properly focus on the issue before us, it should be pointed out that we are not concerned with the public or plaintiffs' use of the waters of Lake Chelan which seasonally overflow defendants' premises. During such period of flooding, the surface of the lake is thereby expanded and the public may well have the right to use the waters for all navigational uses. That is not the issue before us. Rather, the issue is whether the use of these expanded waters, while in existence, confers on the public the right to have such inundation of defendants' lands continued. It is in this connection that we must review the record for substantial evidence to support the trial court's finding that the use was adverse. Was the use such as to put defendants on notice that a hostile claim was being exercised so that inaction on defendants' part would deprive them of the property? I think not. There would be no reason to object to the boating, fishing and swimming in these waters as defendants did not claim a right to the waters. They claim only the seasonally submerged land. The use of the lake

surface was not, in itself, harmful to defendants' property rights. A protest would have been most unnatural as well as unneighborly.

We have long recognized a different rule for adverse possession of open, vacant and unoccupied lands from that applying to enclosures. *Watson v. County Comm'rs of Adams County,* 38 Wash. 662, 80 P. 201 (1905). In *Watson* we quoted with approval from *O'Connell v. Chicago Terminal Transfer R.R.,* 184 Ill. 308, 56 N.E. 355 (1900):

> where land is vacant and unoccupied and remains free to public use and travel until circumstances induce the owners to enclose it, the mere travel across it, without objection from the owners, does not enable the public to acquire a public road . . . [it] is regarded merely as a permissive use.

We then observed

> [I]n order to give a prescriptive right, the use must at least be such as to convey to the absent owner reasonable notice that a claim is made in hostility to his title. It seems to use that any other rule amounts to a practical confiscation of private property for public purposes.

This rule is with sound reason because to take property by user there must be the element of notice to the owner of the allegedly servient estate that the user is laying a claim by the use. To break an enclosure, use an occupied area, or use property in any manner which gives a reasonable person notice of a claim against his property will give rise to an inference that the use is adverse. *Cuillier v. Coffin,* 57 Wn.2d 624, 358 P.2d 958 (1961).

Conversely, use of property which is open, vacant and unimproved creates no such notice. A reasonable person could not be expected to assume hostility solely from a use which is not interfering with his own use of his own land. It seems only reasonable that the rule applicable to open, vacant and unoccupied lands should apply to the instant case. If so applying the rule, I find no evidence at all to support a finding of hostile and adverse use.

I have reviewed the trial court's oral decision to determine the basis for his finding that plaintiffs' use was ad-

verse. There is no discussion of the point. He discussed only the time and continuity elements. Thus, in my opinion, the finding of a prescriptive right must fall.

The majority opinion reaches the conclusion that the fill on defendants' lots is to be removed on the basis that this fill constitutes an obstruction to navigation. Analogizing from the rule that the public has the right to the use of navigable water at both high levels and low levels, subject to the right of littoral owners to reasonably obstruct them with "aids to navigation" such as docks, wharfs, etc. (see 31 A.L.R. 976 (1924)), the majority holds that fluctuations of water levels which are artificially created are no different then fluctuations created by nature.

The difficulty, as I view it, is that under the majority's holding there is a taking of defendants' property right for public use without just compensation. Defendants (through their antecedents in the chain of title) have a full fee title diminished *only* by the right of the power company to periodically inundate their lands to a specific elevation. I see no reason in law or equity for preventing such an owner from protecting his land against such inundation by raising the grade of the land.

The periodic flooding involved here is entirely different from a natural raising and lowering of the lake level by reason of rains, seasonal runoff, and drought. In the latter instance, the littoral owner's rights to the foreshore lands between high and low water, whatever these rights may be, are subject to the public's navigation rights. Here, the defendants' lots, *all of which lie above natural high water,* are not subject to public navigation rights unless there has been a voluntary conveyance, eminent domain proceedings, estoppel, or loss through prescription. Unless precluded by one of the aforementioned reasons, defendants have the right to use their lots, including the right to change the grade thereof, in order to make any lawful use thereof. Accordingly, I do not agree that the fill on defendants' lots is unlawful. They should not be required to remove it.

I am in accord with the majority's conclusion as to the vacated streets. Defendants' claim of ownership of the vacated streets, whatever it may be, is limited by the terms of the 1927 conveyance from Chelan Electric Company to the public. Accordingly, defendants do not have a right to raise the level of the street area and thereby deprive the public of the access and use of the water over the vacated streets. Any fill on these vacated streets should be abated. I also agree that the damages recoverable are limited to interference with rights of navigation.

I would remand with instructions to limit an abatement order to the area of the vacated streets and limit plaintiffs' proof of damages to their loss of navigation rights, primary and secondary, caused by the fill on the former street area.

HUNTER, C. J., and DONWORTH, J. Pro Tem., concur with NEILL, J.

May 7, 1970.. Petition for rehearing denied.