[No. 2779-1.    Division One.    February 2, 1976.]

WEST WATERWAY LUMBER COMPANY, *Appellant*, v. AETNA INSURANCE COMPANY, *Respondent*.

*Carney, Stephenson, Siqueland, Badley & Smith* and *Milton C. Smith*, for appellant.

*Merrick, Hofstedt & Lindsey, H. J. Merrick*, and *Thomas V. Harris*, for respondent.

[As amended by orders of the Court of Appeals February 10 and March 5, 1976.]

FARRIS, J.—On April 13, 1971, the West Waterway Lumber Company purchased an obsolete Navy refrigeration ship known as the *Sirius*[1] for dismantling and scrapping from the Maritime Administration of the United States Department of Commerce. Under the contract of sale, WWLC was required to remove the ship, or pay the cost of removal, from any location in which it became a hazard or obstruction to navigation.

WWLC began scrapping the *Sirius* at its pier located adjacent to the navigable waters of the West Waterway in

---

[1] The *Sirius* was 435 feet long, 63 feet wide, and 135 feet high as measured from the keel to the top of its mast.

Seattle. The operation was approximately 20 percent complete when on January 28, 1972, the ship caught fire and rolled over in such a manner that it partially extended into the navigable waters of the West Waterway and became an obstruction to navigation. In addition, a quantity of oil subsequently escaped from the *Sirius* and polluted the waterway. At the time of trial WWLC had spent sums in excess of the policy limits in attempts to remove the *Sirius* from the West Waterway. It also incurred fines amounting to a total of $800 from the Washington State Department of Ecology and the United States Coast Guard because of the oil leakage.

At all times pertinent hereto, WWLC had in full force and effect a "Comprehensive General Liability Insurance Policy" issued by the Aetna Insurance Company. The policy provided:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
> Coverage A. bodily injury or
> Coverage B. property damage
> to which this insurance applies, caused by an occurrence,
> . . .

The term "property damage" was defined in the policy:

> "[P]roperty damage" means injury to or destruction of tangible property.

The term "occurrence" was defined in the policy:

> "[O]ccurrence" means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

Aetna only paid the costs incurred in the initial installation of buoys around the *Sirius* as required by federal law and the Coast Guard. WWLC initiated this action to recover the costs it incurred, up to the policy limits, in removing the ship. It appeals from a denial of recovery.

The trial court based its ruling on (1) its finding that

"[t]here has been no property damage suffered by third parties," and (2) its conclusion that "[t]here has been no 'occurrence' within the meaning of the policy for the reason that there has been no damage to property of third parties." Finding of fact No. 10; conclusion of law No. 3.

WWLC contends that it is entitled to recover the amounts it paid as fines and the costs of removal, up to the policy limits, on the ground that the public, the City of Seattle, the State of Washington, and the federal government all sustained "property damage" from (1) the oil leakage and (2) the obstruction to navigation which was created by the presence of the *Sirius*.

In arguing that it is entitled to recover the costs, up to the policy limits, which it incurred in raising the *Sirius*, WWLC relies upon 33 U.S.C. § 409 (1970) which requires, among other things, that the owner of any vessel which is negligently sunk and becomes an obstruction to navigation must immediately commence operations to remove it. Although this statute was the basis of the demand by the United States Corps of Engineers that WWLC remove the *Sirius* from the navigable portion of the West Waterway, it does not resolve the issue of whether the presence of the *Sirius* constituted "property damage" under the policy. It merely defines the responsibilities of the vessel owner.

WWLC contends that *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 19 L. Ed. 2d 407, 88 S. Ct. 379 (1967) and *Wilbour v. Gallagher*, 77 Wn.2d 306, 462 P.2d 232, 40 A.L.R.3d 760 (1969) stand for the proposition that an obstruction to navigation constitutes "property damage" to public waters. We disagree. In *Wyandotte*, the Supreme Court affirmed the holding of the Fifth Circuit Court of Appeals:

> [U]nder the Rivers and Harbors Act of 1899, 30 Stat. 1151 *et seq.*, as amended, 33 U.S.C. § 401 *et seq.*, the United States may assert *in personam* rights—to injunctive or declaratory relief or damages—against those responsible for the negligent sinking of a vessel.

*Wyandotte Transp. Co. v. United States, supra* at 193. In

*Wilbour*, the Washington State Supreme Court ordered the removal of several fills which had been made in Lake Chelan on the ground that they constituted an obstruction to the public's right of navigation. *Wilbour v. Gallagher, supra* at 313-16. Although the public's right of navigation was similarly obstructed in the instant case, the question is whether that obstruction in and of itself constituted "property damage" to public waters. The policy defines "property damage" as "injury to or destruction of tangible property." Here, there was no injury to tangible property. The *right* of the public in the waterway is not tangible property.

WWLC further argues that the presence of the *Sirius* constituted "property damage" because it resulted in a loss of use of the waterway. We have reviewed the examples cited in WWLC's brief as support for this contention. In each example, there was some monetary loss (damage) to a third party. Here, although the *Sirius* constituted an obstruction to navigation, there is no evidence in the record of any monetary loss through delays, blockage, etc. We therefore find no basis for concluding that the obstruction damaged third parties.

WWLC also argues that Aetna is obligated to pay the costs of righting the *Sirius* under the contractual liability endorsement to the policy:

CONTRACTUAL BODILY INJURY LIABILITY
CONTRACTUAL PROPERTY DAMAGE LIABILITY

The company will pay on behalf of the insured all sums which the insured, by reason of contractual liability assumed by him under any written contract of the type designated in the schedule for this insurance, shall become legally obligated to pay as damages because of

bodily injury or
property damage

to which this insurance applies, caused by an occurrence, except the liability of the indemnitee resulting from his sole negligence and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are ground-

less, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, . . .

It is contended that coverage exists under this endorsement because under the contract of purchase, WWLC was obligated to remove the *Sirius* from any location in which it became an obstruction to navigation. That argument fails to recognize the purpose of the contractual liability endorsement. It is not intended to provide general coverage for *any* liability which the insured may be subject to under a contract to which it is a party. Rather, its purpose is to provide coverage in the event the insured is held liable under a "hold harmless" or "save harmless" clause.

■ Finally, WWLC submits that in view of the rules established in *Glen Falls Ins. Co. v. Vietzke*, 82 Wn.2d 122, 508 P.2d 608 (1973), the policy must be construed to provide coverage for the events which occurred in this case. We disagree. The terms of the policy here are clear and unambiguous; we therefore do not have a situation analogous to *Glen Falls*.

■ The fines which WWLC paid because of the oil leakage were penalties. We have been cited no authority for the recovery of a penalty under the property damage provision of a general comprehensive liability policy. The question of Aetna's liability for any damage caused by the oil leakage is not before us.

Affirmed.

JAMES and CALLOW, JJ., concur.

Petition for rehearing denied May 20, 1976.

Review denied by Supreme Court August 31, 1976.