Strafford,
Nov. 5, 1935.

HAROLD P. WHITCHER

*v.*

STATE OF NEW HAMPSHIRE *& a.*

*Leonard C. Hardwick, Burt R. Cooper* and *Conrad E. Snow (Mr. Snow* orally), for the plaintiff.

*Francis W. Johnston, Attorney-General,* and *John P. Carleton (Mr. Carleton* orally), for the state.

The individual defendants furnished no briefs.

*Robert J. Peaslee* and *John H. Sanders* with *Robert W. Upton, amici curiae,* furnished briefs.

PAGE, J. The case is titled erroneously. The state is not a party. The petitionees are the attorney-general and three individuals owning lots on the shore of North River pond. No title or right claimed by the state need here be adjudicated, and remarks in this opinion relating to any title or right of the state are *dicta.* The rights involved are solely those of the plaintiff and the three littoral owners who are defendants. The latter have certain private rights as shore owners; in common with others not such owners, they have also certain rights as members of the public. It would seem that the three individuals are competent to represent their public rights without the intervention of the attorney-general either as a party or as their counsel. No judgment against other members of the public would appear to be possible from the fact that the attorney-general was sought to be made a party. He could be sued no more than the state, *Bow* v. *Plummer,* 79 N. H. 23. The only defendants are the littoral owners.

North River pond, in its natural state, was a great pond in which the general public had the rights incident to such waters. More than seventy years ago the plaintiff's ancestor in title, owner of a mill-privilege on the stream issuing from the pond, erected a dam at the outlet of the pond which raised the level of the water seven feet.

That dam and one or more others in succession have since then been maintained at that height except during such times as replacements were being constructed. Rights of flowage to the level of the dam were obtained by deed from certain of the owners of the littoral of the pond, and the land of the other littoral owners has been flowed since that time in accordance with the use to which the mill-privilege meanwhile has been put.

To the extent of the user, it seems to be conceded that as against the littoral owners who made no grant, and their successors in title, the plaintiff has by prescription a right of flowage for the benefit of his dominant tenement. *Griffin* v. *Bartlett*, 55 N. H. 119. But no such prescription can be claimed by the plaintiff as against the public rights of fishing, fowling, flotation, bathing or taking ice. *State* v. *Company*, 49 N. H. 240, 254; *Collins* v. *Howard*, 65 N. H. 190; *State* v. *Welch*, 66 N. H. 178. Nor can there be any estoppel because of laches or neglect of the general public to exercise their rights. *State* v. *Hutchins*, 79 N. H. 132, 139. There does not appear to be any legislative grant, which would be the only way of effecting a diminution of public rights for the benefit of the owner of the Whitcher property. *Concord Mfg. Co.* v. *Robertson*, 66 N. H. 1, 6, 12, 22.

It is a matter of common knowledge that the primary, if not sole, purpose of such a dam is to impound waters at times of unusual run-off and to draw them off for the use of mills during periods of subnormal flow. Equalization of flow to enable mill-wheels to turn in summer and autumn, when nature might leave them idle, is well recognized to be useful to manufactures and indirectly for the benefit of the public as a whole.

The object in this instance seems not to have been otherwise. The user has been consistent with that intention except at such times as the plaintiff has not needed the power. The dam has a gate, and the successive owners have controlled the gate for the purpose of letting water down to their mill-privileges below, where another dam holds back the immediate mill-pond. Prior to 1905 the power was used to run two plants, a grist mill and a wood-working mill. In that year the grist mill was discontinued, but the wood-working mill was run by water until 1925, since when it has been operated by a gasoline engine. The bulkhead and waterwheel at the lower dam have now rotted, and there has been no water in the lower pond since about 1928. Before the mill can be operated again by water power, there must be a new lower dam, penstock and wheel. Prior to 1918 the plaintiff and his predecessors drew water through the outlet dam as

needed. The summer use generally reduced the water of the lake gradually to its natural level. From the middle of June flats began to be exposed, as well as an island in the middle of the lake. As the water receded, abutting owners who used their lands for pasturage, extended their fences over the exposed shore to the water-line. At low draft, the Boody Flat of about three acres in area, extending some four hundred feet, exposed soft mud. The water remained at this low level until raised by a heavy rainfall.

From 1918 to 1925 the plaintiff regularly drew water, but the level of the lake remained at or near maximum. Since then he has drawn no water for use at his mill. In 1930 the outlet dam needed repairs, and in August of that year the plaintiff drew the water down to the natural level and started his repairs. Abutting owners, among them the defendants, sought by bill in equity a decree ordering the plaintiff to close the outlet and restraining him from lowering the waters. Upon the plaintiff's agreement to build a "permanent cement dam" to the height of the old, the injunction proceedings were dropped, but with the threat that if the level was again reduced, further proceedings would be brought. In the face of this threat, the plaintiff sought definition of his rights.

The plaintiff at first contended that the defendants have no right to control his drawing at will from the reservoir, but has altered his ground in some degree. At present his contention is that the defendants may not interfere with his use of the reservoir by a reasonable drawing between the artificial and natural levels. The defendants claim to have the right to restrain him from regulating the flow by means of the gate in the dam, which would leave the plaintiff only a reasonable use of the natural flow from an artificially enlarged permanent great pond.

The issue is therefore confined to the use by the plaintiff of the excess storage created by his dam. There is no contention that the dam is a nuisance that should be abated. On the contrary the defendants claim in effect that the plaintiff must maintain the dam at his own expense for their sole benefit, and that he shall be deprived without compensation of the beneficial use of his property and be at the cost of maintaining it. They do not so state their contention, but that is their real meaning. So restated, and we think correctly, their position becomes so doubtful that it can be sustained only upon clear grounds of reasoning.

The defendants do not attack the right of the plaintiff and his predecessors to raise and maintain a dam. If that is a wrong done

to their rights, they do not choose to have the wrong abated, but rather to have a wrong perpetuated because incidentally to its use they have derived at certain seasons benefits to themselves from the increased level of the reservoir, benefits which they now insist are rights of their own which they may exercise permanently at all seasons. In other words, they claim rights to enjoy permanently the artificial level of the pond, and not merely at such times as the reasonable demands of the plaintiff do not require the water to be drawn below that level.

The common law of New Hampshire with regard to rights in great ponds of ten acres or more (*Dolbeer* v. *Company*, 72 N. H. 562) is not the common law in England. The lord of the manor might exclude all others from a great pond entirely surrounded by the manor. But the immigrants to New Hampshire "brought, not the whole body of written and unwritten laws under which they had enjoyed rights and suffered wrongs, but only such as were suited to their condition and wants, consistent with their new state of society, and conformable to the institutions they intended to establish, and the general course of policy they intended to pursue." *Concord Mfg. Co.* v. *Robertson*, 66 N. H. 1, 7.

In this state any member of the public may exercise a common-law right to boat, bathe, fish, fowl, skate and cut ice in and on its public waters. Whether or not this right is limited to ponds to which access may be had without trespass need not be decided in this case, since it appears that the public from time immemorial has had two approaches to the pond. Some technical theory of title has been found convenient to support this common right. The one adopted is that the king at first had the legal title to all the land, whether dry or covered with water, but that his ownership of the soil of great ponds was held subject to the public rights named. At the Revolution the state succeeded to the legal title of the king. Neither the king nor the state, when granting title to private proprietors of estates or towns, parted with the soil of great ponds. The public rights to use the waters are inalienable except by legislative grant. Littoral owners have title only to the natural high-water mark of such ponds and have no interest at all in its bed.

They have precisely the same rights as the public in the use of the waters for the purposes named. Their use of the waters otherwise than in exercise of their public rights, "like a riparian owner's use of a fresh river flowing over his land, is governed by the rule of reasonableness applied to the facts of . . . [the] case." So "the con-

clusion is unavoidable that the rights of abutters and the public in American public waters are the whole property, and not merely what was left for the subjects of the realm by the ancient monopolies of the English executive and the manorial lords." *Concord Mfg. Co.* v. *Robertson, supra,* 18, 19, 20; *State* v. *Company,* 76 N. H. 373.

"So far as respects the bed of the natural pond, the plaintiffs acquired the right to have it flowed by becoming the owners of the land at the outlet, and no one could interpose any objection to such use. This right, then, did not depend upon prescription, but was an incident of the land. For aught we can see, it stands upon the same ground as in the case of a running stream . . . ." *Cocheco Company* v. *Strafford,* 51 N. H. 455, 461. "As an incident of the ownership of the land on which a dam can be built which will control the flow of water from the pond, he has the right to a reasonable use of the pond for a reservoir." *Dolbeer* v. *Company,* 72 N. H. 562, 565. And see *State* v. *Company,* 76 N. H. 373. The case of *Concord Mfg. Co.* v. *Robertson, supra,* applied to littoral owners the same principle of reasonable use that is applied to riparian owners. In that case the plaintiff had owned the outlet and had erected a dam to raise the waters of the pond for use as a reservoir in connection with its mill on the outlet stream. It still owned rights to control the passage of water through the dam, though the city of Concord had meanwhile acquired title to the dam and the right to divert a fixed quantity of water for supplying the city and its inhabitants.

We have found nowhere any decision which places in different classes the right to maintain a dam on a stream and that to maintain one at the outlet of a great pond for reservoir use. That there is no distinction in right, but only one of adaptation, appears clear upon reason. The "condition and wants" of the settlers of New Hampshire, "their new state of society" (*Concord Mfg. Co.* v. *Robertson, supra,*) argued for both rights as incident to ownership of the land. The rights of the riparian owner in respect to water in a stream have a certain relationship to the rights of other riparian owners and the public therein. The relationship is in reason precisely the same between the owner of the outlet and other littoral owners and the public. The common understanding that this is so has been shown by the frequent raising of dams at outlets of great ponds and the control of the enlarged reservoirs, by failure of the legislature ever to grant such a right, by legislative recognition of that right without a special grant (Laws 1850, *c.* 1057; Laws 1864, *c.* 3062), by judicial recognition (*Winnipissiogee &c. Co.* v. *Worster,* 29 N. H. 433; *Winnipiseogee*

&c. Co. v. *Young*, 40 N. H. 420; *Holden* v. *Company*, 53 N. H. 552; *Bucklin* v. *Truell*, 54 N. H. 122; *Horne* v. *Hutchins*, 71 N. H. 117; *Winnipiseogee &c. Co.* v. *Gilford*, 64 N. H. 337; *Winnipiseogee &c Co.* v. *Gilford*, 67 N. H. 514; *Cocheco &c. Co.* v. *Strafford*, 51 N. H. 455; *Newmarket Mfg. Co.* v. *Nottingham*, 86 N. H. 321). In the four cases last cited, it was held that the plaintiffs had acquired reservoir rights and that such rights were taxable as property. In none of the cases cited was the point of right especially argued. Nobody doubted it—parties, counsel or court. If the point had been distinctly urged that there was no legislative grant in any of these cases, we think the result would have been sustained on reason and common practice.

No dam, whether on stream or at outlet of a natural pond, will be permitted to destroy or unduly diminish the public rights to navigation and the free passage of migratory sea fish. But the public's right in an artificially controlled water at the most is measured by the extent of its right in the water in its natural condition. As to fish, however, the public is not always entitled to the full benefit of the state of nature, but only to artificial fish-ways in the dam. Fish may be inconvenienced, but the owners of logs may not be, *State* v. *Company*, 49 N. H. 240; *Connecticut &c. Co.* v. *Company*, 65 N. H. 290.

It does not appear that migratory fish were ever wont to spawn in North River pond, or that the outlet was navigable in the state of nature. It is not claimed that the plaintiff's dam interferes with any right of the public in the natural pond. On the contrary, the defendants desire the dam maintained.

The plaintiff has the right to impound waters as against the public and he has a corresponding easement as against the defendants. He can be denied the reasonable use of the reservoir only if expressly or impliedly he has made some grant of an adverse right to the defendants.

It is suggested that the plaintiff has dedicated such a right.

From time immemorial there has been a small bathing beach on the northerly shore of the pond to which the public had means of access. This beach, when the water is at its full artificial level, is larger than when at its natural level. At the latter level the bottom falls abruptly and the beach is less suitable for bathing, particularly for children, and there is increased danger. It is also true that from time to time the state has stocked the pond with fish, and that, when the shores are exposed by the drawing down of the water, feeding areas for the fish are reduced and the fish more easily escape down the outlet stream unless the bulkhead of the dam is screened. The

drawing down of the water by the plaintiff has a tendency to depreciate the value of the shore property and retard its development for summer recreational purposes and thus to deprive the state and municipalities of tax revenues.

It thus appears that the raising of the waters to the maximum artificial level incidentally benefits the public, and that the only possible complaint the public may make is that the draining of the water below that level intermittently deprives the public of those benefits but never deprives them of such uses as the natural pond made possible. In essence the defendants claim that the littoral owners and others who may have access to the pond without trespassing are entitled by reason of dedication to the permanent enjoyment of all the enhanced rights of fishing, swimming and boating attaching when the level of the pond is "natural" to the dam, in other words that the level of the pond seven feet above the original level has been dedicated to the public and is to be regarded for legal purposes as the natural level of the pond, so that the plaintiff may not artificially disturb it.

The user by the plaintiff and his predecessors from the time the first dam was raised until 1918, a period of over forty years, was continuously one which negatives any intention to dedicate to the public the right to have the dam hold back any water above the natural level except at such times as it should be stored because not needed for immediate use at the mill-privilege. Conversely the "acceptance" by public user was no more than the enjoyment of the benefits of the water when not drawn for use in connection with the mill-privilege. The relative non-user by the plaintiff from 1918 to 1925 and the complete non-user from 1925 to 1930 are not under the circumstances persuasive of an intention to dedicate. The drawing off of the water in 1930 and the events since then cannot establish such an intention. If there was any dedication at all, a point unnecessary to decide, it is impossible to find that there was any of the right to have the level permanently maintained. A dedication is limited to what the circumstances clearly imply was the intention of the owner. It must also be accepted by the public, and acceptance is commonly evidenced by the public user. Upon the issue of intention also the extent of the user by both dedicator and the public are to be considered. *State* v. *Nudd*, 23 N. H. 327, 328; *Willey* v. *Portsmouth*, 35 N. H. 303, 311; *Hayden* v. *Stone*, 112 Mass. 346; *Wason* v. *Nashua*, 85 N. H. 192.

Nor have the defendants acquired by prescription the right to have the maximum artificial level maintained except for the natural outflow.

Doubtless prescription may run in favor of the public, but the public cannot claim that its members have exercised a user of the waters at the permanent level which is adverse to the plaintiff. All they have done is to enjoy intermittently certain enlarged uses of the waters, the times and extent of the enjoyment depending solely upon the quantities that were drawn for use at the plaintiff's mill-privilege. Not until within five years have they even asserted their supposed right adversely to such drawing. Prior to that time their boating upon whatever level the pond attained, whether artificial high-water mark, natural low-water mark, or somewhere between, their fishing and swimming in such waters as were accumulated from time to time, were consistent with the drawing of the water for the mill-privilege and never hostile to it.

As littoral owners the defendants are in the same situation, except that as far as their rights of private property are concerned they are themselves subject either to flowage rights granted by their ancestors in title or to prescriptive rights of the plaintiff to the rise and fall of the waters of the pond. The littoral owners of tenements servient to the plaintiff's property seem to be in no situation as such to claim prescriptive rights to have the artificial high-water mark regarded as the natural level of the pond.

We see no cause for abandoning the classical view that the defendants could acquire a prescriptive right to the maintenance of the level only by an adverse user hostile to the plaintiff's claim. No such adverse user by the defendants appears. On the contrary, prior to the seeking of the injunction in 1930, the defendants and their grantors, it seems, never made an adverse claim. They enjoyed the beauty of the water in such quantities as were present; they had access to the water, sometimes at one height, sometimes at another. As for the rest, they enjoyed the waters, wherever they were, in such manner as littoral owners could enjoy the peculiar rights they possessed in addition to those possessed by the public. No such act of enjoyment could constitute an adverse claim to a maximum water-level that was from time to time existent only in airy fancy. Incidental intermittent enjoyment was not hostile to the plaintiff and afforded no basis for legal process by him. The defendants, as littoral proprietors, have no prescriptive right to have the plaintiff maintain or manage his dam so as to keep the water at the crest of the dam. Whether there has been an adverse user establishing the right of the defendants to customary seasonal levels we need not inquire. The plaintiff is not at present proposing to abandon his right

to flow and draw; the issue is made by the defendants' claim that the plaintiff may not draw what does not flow out of the pond naturally.

Some specific reference is required to the claim of the defendants, based upon *Taggart* v. *Jaffrey*, 75 N. H. 473, that the plaintiff is estopped to deny his liability to maintain the level of the water for their benefit. Prior to 1918 only one cottage was erected on the shore of the pond, that one having been built in 1895. Since 1918 other summer cottages have been built, and there are now more than forty which are occupied during the summer and a few during the entire year. The taxable property on the lake shore has within a few years increased about $50,000. At the time when most of the cottages were built, the water had remained at its high level for ten years or more. Many of the cottagers built without personal knowledge of the plaintiff's claim of right to control the waters of the pond. On the other hand, the dam was there, and the presence in it of a gate was notice of its purpose, which could be nothing else than to draw the water from the pond. *Peter* v. *Caswell*, 38 Oh. St. 518; *Mitchell Drainage District* v. *District*, 127 Neb. 484. The non-user without abandonment of the right to draw from the reservoir (*New England &c. Co.* v. *Wood*, 81 N. H. 124) was no representation by the plaintiff that he would maintain the water forever at the maximum level. The gate in the dam, on the contrary, was a continuous notice and threat that the water might be let through. The visible dam and gate were sufficient to put the defendants on inquiry, and had they inquired they would readily have found records of the grants of flowage as to some of the littoral lots and a prescriptive user as to others. They would have found that the plaintiff had not abandoned his rights. Under these circumstances it cannot be said that in making their improvements the littoral proprietors relied upon any representation of the plaintiff that will estop him. Nor can it be urged successfully that the plaintiff stood by, saying nothing, while the improvements were being made. The plaintiff does not appear to have had any occasion to suppose that the shore-owners were overlooking what was obvious, or were ignorant of a claim which inquiry would have disclosed. He had never pretended that he would not vary the level of the pond in accordance with a use of long standing; why should he suppose that anybody would rely on such a pretense? No representation by silence can be inferred. *Fox River &c Co.* v. *Trelley*, 70 Wis. 287, 303; *Allen* v. *Shaw*, 61 N. H. 95; *Stevens* v. *Dennett*, 51 N. H. 324.

We see no reason lying in prescription, dedication or estoppel for

supporting the claim of the defendants that the plaintiff may not use the reservoir between the limits of the artificial high-water mark and the natural low-water mark. Of course, like every other use of water in an artificial state it will be limited by the grant. So far as the grant by the littoral owners was implied by prescription, it must be limited to the use made of the reservoir for the prescriptive period, and must be confined to use for development of power at the plaintiff's mill-privilege. *Griffin* v. *Bartlett*, 55 N. H. 119.

The case does not call for a determination of what particular user will be reasonable or otherwise. What is a reasonable use is a question of fact. *Ladd* v. *Company*, 68 N. H. 185, 186. Seemingly, when a question does arise, the occasion, object, necessity and extent of the act of user will be considered. *Davis* v. *Winslow*, 51 Me. 264, 291. Doubtless also it will be considered that the plaintiff, with respect to use at his mill, is the dominant owner, and the littoral owners are servient, and that even public rights may in some instances be subservient. Yet the rights of the defendants will never be subject to the whim, caprice or malice of the plaintiff in appropriating use of the water. The defendants have a right to protection against the irrational conduct of the plaintiff in the use of his rights to flow and draw until at least such times as he may grant or abandon them. *Taft* v. *Company*, 237 Mass. 385. Nevertheless the plaintiff's right is to use as much water, at least down to the natural low-water mark, as is necessary for use at his privilege, provided he makes no intentional misuse and causes no unnecessary annoyance and damage to the defendants. *State* v. *Company*, 70 N. H. 458, 461. Having acquired by prescription and otherwise rights as against the littoral owners to draw for his seasonal needs at his mill-privilege, having that right as against the public at common law, his rights are not limited except (1) by such needs, (2) by the storage between the artificial high-water mark and natural low-water level, and (3) a use that shall be reasonable in the sense that it shall not be maliciously, capriciously or arbitrarily appropriated for other uses, and shall not be so used as to cause annoyance and damage to the defendants that are unnecessary to the use within the limits stated. *Sakansky* v. *Wein*, 86 N. H. 337; *Stevenson* v. *Wiggin*, 56 N. H. 308; *Olcott* v. *Thompson*, 59 N. H. 154; *Berry* v. *Hutchins*, 73 N. H. 310; *Chapman* v. *Company*, 74 N. H. 424.

*Case discharged.*

All concurred.