SELIG WEINSTEIN & others *vs.* LAKE PEARL PARK, INC.

Norfolk.  December 3, 1963. — February 28, 1964.

Present: WILKINS, C.J., SPALDING, CUTTER, & SPIEGEL, JJ.

*Real Property,* Boundary, Shore property.  *Great Pond.  Nuisance.*

A certain deed describing boundaries of land on a great pond dammed at
an outlet many years before as by or to "the shore line . . . at high
water" must be construed in the circumstances as not including flowed
land below that line.  [94]

Owners of land on a great pond used as a summer resort and for outings
and parties suffered a "special and peculiar damage" not common to
the public when an adjoining landowner, without a license from the
Department of Public Works under G. L. c. 91, § 13, put fill in the
pond opposite the resort owners' land, thereby making portions thereof
"wetter, caused by springs pushing up and creating spongy spots," and
were entitled to relief from such filling to the extent that their land was
damaged thereby.  [95]

BILL IN EQUITY filed in the Land Court on March 26, 1959.

The suit was heard by *McPartlin, J.*

*Reuben Goodman (Sydney Berkman* with him) for the
plaintiffs.

*George P. Davis* for the defendant.

SPALDING, J.  The plaintiffs own property in Wrentham
which is bounded on one side by a body of water known as
Lake Pearl.  This property will sometimes be referred to
hereinafter as the Weinstein land.  The defendant owns
property adjoining the Weinstein land which is also bounded
on one side by Lake Pearl.

The plaintiffs bring this bill in equity in the Land Court
and allege in substance the following: The defendant put
quantities of fill in a cove between the Weinstein land and
the defendant's land, thereby narrowing the cove consider-
ably.  The defendant also changed the course of a ditch
emptying into the pond by running a thirty inch concrete
culvert into the cove so that it empties at a point closer to
the plaintiffs' upland.  The defendant erected two fences.

One of them encroached on part of the plaintiffs' land and the other interfered with the plaintiffs' rights in a way.

The plaintiffs prayed that the boundaries between the Weinstein land and the defendant's land be established; that the defendant be ordered to relocate the fences in accordance with such boundaries; and that the ditch be restored to its prior location.

The evidence is reported and the judge made findings of facts of which the following is a summary. Lake Pearl, on which the Weinstein land and the defendant's land border, is a great pond. According to a 1954 plan which was in evidence there is a cove between the Weinstein land and the land of the defendant.[1] The mouth of the cove is forty-five feet in width and it narrows down to a width of twenty-three feet. At some distance south of the existing shore line the plan shows a line marked 195 which was determined to be the natural edge of the pond. The area between this line and the shore line was a flowed area. The pond was originally a millpond, the dam at the north outlet having been built between 1670 and 1680; it was rebuilt in 1952 or 1953. There is no evidence as to "when the pond was raised to its present level or as to the length of time it has been at its present level." At the entrance of the cove the water is two feet deep. The defendant's property is to the west of the Weinstein land and according to a decree of registration entered in the Land Court is bounded "by Lake Pearl" and is subject "to any and all rights of the public in the use of said Pond as a great pond."

The Weinstein land, on which there is a hotel with thirty-four rooms, is used as a summer resort. The premises are also used for outings and parties. This use "makes the condition of the grounds as important as that of the building."

In the latter part of the 1940s changes occurred in the cove. Fill was put into it in front of lot 13 which is owned by the defendant. In 1954 or 1955 fill was put in in front

---

[1] This plan was made by the Division of Waterways of the Department of Public Works.

of lot 14 which is part of the Weinstein land. When this occurred Selig Weinstein, one of the plaintiffs, protested on the ground that it was diminishing the area of water in the cove. The defendant caused fill to be placed opposite lots 15 and 16 of the Weinstein land which are to the east of lot 14. This was placed in the area lying between the existing shore and the shore line shown on a Land Court plan dated March 12, 1919. "As a result of the fill put into this part of the cove, Lots 14, 15 and 16 have been made wetter, caused by springs pushing up and creating spongy spots. The plaintiffs have installed drains to correct the wetter conditions on these lots." As to any filling in the area east of lot 16 the "evidence is indefinite as to what is filled and what was caused by the action of the winds."

 Formerly, commencing at the southwest corner of the defendant's lot 13 and running in a northerly direction was an open ditch which carried water from Lake Archer to Lake Pearl. The defendant constructed a thirty inch concrete pipe for the purpose of carrying this water and filled in the ditch. The pipe now empties below the southwest section of the plaintiffs' lot 14.

In 1954 or 1955 the defendant erected a chain fence. The fence at two points extends into First Avenue which runs between the Weinstein land and the defendant's land. Although the defendant owns the fee in this way it is "subject to the rights of all persons lawfully entitled thereto in and over the same." The boundary line between the plaintiffs' land and the defendant's land, fixed by the judge, is the southeasterly line of First Avenue. He ruled that to the extent that the fence was on a portion of First Avenue it was unlawful.

Lake Pearl, the judge found, is a great pond. While finding that the defendant, without a license or permit, has run a culvert into the pond and has put fill in it, he ruled that such rights as may have been violated by these acts were public rights and that the plaintiffs had no standing to enforce them.

A final decree was entered adjudicating that the bound-

ary line between the plaintiffs' land and that of the defendant is the southeasterly line of First Avenue; that Lake Pearl is a great pond as defined by G. L. c. 91, § 35; that the plaintiffs have no standing to enforce public rights in a great pond; and that the defendant be permanently enjoined from erecting and maintaining a fence on First Avenue. The plaintiffs appealed.

Those portions of the final decree establishing the boundary line between the plaintiffs' and the defendant's land and permanently enjoining the defendant from erecting and maintaining a fence on First Avenue are not challenged and need not concern us.

The plaintiffs have argued that they owned some of the flowed land which was filled in by the defendant. But the title under which the plaintiffs claim does not give them any of that land. The plaintiffs have only the rights of Pierotti, their predecessor in title, and Pierotti's deed from Dwyer, which conveyed two lots, described the Lake Pearl boundary of one of them as: "to Lake Pearl; thence southerly by the shore line of said Lake Pearl at *high water*" (emphasis supplied). As to the other lot the boundary was: "to the shore line of said Lake Pearl at *high water;* thence southerly forty-five (45) feet to land now or formerly of Lee A. Strople" (emphasis supplied). From the evidence and the findings we conclude that the high water mark referred to in that deed was approximately along the shore line shown in a Land Court plan dated March 12, 1919, and excludes the flowed land. As to the right of an owner to convey in this manner see *Bardwell* v. *Ames,* 22 Pick. 333, 354–355. Thus the plaintiffs have no rights of ownership in any land below this shore line. See *Brady* v. *Blackinton,* 113 Mass. 238, 245. Or, stated differently, the plaintiffs have no rights in any of the flowed lands filled by the defendant. The case of *Paine* v. *Woods,* 108 Mass. 160, 172, on which the plaintiffs rely, is not to the contrary. There a pond was raised each winter to an artificial height and lowered again in the spring. In those circumstances the deeds, though given in the winter, were construed as

having granted title to the summer low water mark. Since in the case at bar there was no evidence of any seasonal fluctuation in the water level, there is no basis for construing the deeds under which the plaintiffs claim as conveying land below the 1919 shore line.

Any right which the plaintiffs have to object to the defendant's actions must be based on the fact that the fill and culvert intruded into a great pond. The defendant placed fill and a culvert below the shore line shown on the 1919 plan and thus in Lake Pearl. This act requires a license from the Department of Public Works, G. L. c. 91, § 13, and no license was obtained. Placing fill in a great pond without a license is a public wrong (G. L. c. 91, § 23) and a private action will not lie unless the plaintiff suffers a "special and peculiar damage" not common to the public. *Potter* v. *Howe,* 141 Mass. 357, 360. Such special and peculiar damage has been shown. The judge found expressly that "[a]s a result of the fill put into this part of the cove, [the plaintiffs'] Lots 14, 15 and 16 have been made wetter, caused by springs pushing up and creating spongy spots." This finding gives the plaintiffs standing to seek relief from the defendant's acts of filling to the extent that they damaged their property notwithstanding that "the wrong . . . [was] committed in a manner and under circumstances which would render the guilty party liable . . . for a common nuisance." *Wesson* v. *Washburn Iron Co.* 13 Allen, 95, 103. The case, therefore, must be further heard in order that the plaintiffs' special damage be ascertained.

The plaintiffs also argue that the defendant's filling in of the pond resulted in an extension of its beach and that this caused them special damage by reason of increased noise and impairment of view. The evidence as to these matters was extremely meager and the judge made no findings or rulings touching them. Inasmuch as the case must stand for further hearing on damage, we think it appropriate that the judge should also make suitable findings and rulings with respect to these issues, although these matters do not appear to have much, if any, significance.

The final decree is reversed and the case is to stand for further hearing to the limited extent indicated in this opinion. Such hearing will not affect the paragraphs numbered 1, 2, and 4 of the decree. Accordingly, when a new final decree is entered these paragraphs will be included in it.

*So ordered.*