NEPONSET RESERVOIR CORPORATION *vs.* JOHN M. BASHAW, trustee.

Suffolk.     March 12, 1979. — July 5, 1979.

Present: ARMSTRONG, BROWN, & GREANEY, JJ.

*Real Property*, Boundary, Water, Drain. *Water. Drain.*

In an action based on a claim that the defendant had constructed a drainage pipe which encroached on the plaintiff's land, evidence warranted a finding that the high water mark of the plaintiff's reservoir which was maintained by a dam was at the height of the dam's abutments with flashboards in place. [37-41]

In an action based on a claim that the defendant had constructed a drainage pipe which encroached on the plaintiff's land, the judge was warranted in ruling that, since it was impossible on the evidence to determine precisely where the boundary line between the plaintiff's and the defendant's land was located, the plaintiff had not sustained its burden of proving that the pipe encroached on its land. [41-42]

In an action based on a claim that the defendant's drainage system artificially channeled surface water onto the plaintiff's land, evidence warranted a finding that the water coming through the drainage pipe would reach the plaintiff's land in any event by way of the natural flow of surface water off the defendant's land, and

---

the judge was, therefore, warranted in denying the plaintiff injunctive relief. [42]

CIVIL ACTION commenced in the Land Court on November 3, 1975.

The case was heard by *Sullivan, J.*

*Edward P. Leibensperger* for the plaintiff.

*Richard N. Rougeau & James F. McGillen, II,* for the defendant, submitted a brief.

GREANEY, J. The plaintiff, Neponset Reservoir Corporation (Neponset), sought injunctive relief and damages on the basis that the defendant, John M. Bashaw, trustee of the Willett-Bashaw Trust (the trust), was discharging surface waters from a drainage pipe onto the plaintiff's land. The plaintiff predicated its request for relief on two theories: (1) that the defendant had constructed a drainage pipe which encroached on the plaintiff's land, thereby constituting a trespass, and (2) that the defendant's drainage system artificially channeled surface water onto Neponset's land. After trial, a judge of the Land Court denied the relief sought and entered a judgment dismissing the complaint. The case is before this court on the judge's "Decision" and designated portions of the transcript and exhibits. We conduct our review under the standard that the judge's subsidiary findings of fact will not be set aside unless clearly erroneous. *Sanguinetti* v. *Nantucket Constr. Co.*, 5 Mass. App. Ct. 227, 228 (1977). *Hutchinson* v. *Hutchinson*, 6 Mass. App. Ct. 705, 707-708 (1978). *Cape Cod Hosp., Inc.* v. *Cape Cod Medical Center, Inc.*, 7 Mass. App. Ct. 873 (1979). See Mass.R. Civ.P. 52(a), 365 Mass. 816 (1974).

We first briefly outline the relationship of the two parcels of land involved in the dispute and describe the principal artifacts on each. We make this summary based on such of the facts as are substantially undisputed.

Neponset owns land located in the towns of Norwood, Westwood and Walpole which is mostly covered by a largely artificial body of water known as Willett Pond.

The pond is an impounding reservoir maintained by a
dam constructed around 1913. The actual height of the
water in Willett Pond varies according to the season, the
weather, and whether two valves which control a series
of pipes connected with the dam to provide water to the
Neponset River are open or closed. The plaintiff is re-
quired by the State to maintain a certain flow of water in
the Neponset River and uses the system of valves and
pipes to release water from the pond to add to the river's
flow as needed. The height at the top of the dam's abut-
ments with the flashboards in place is 140.68 feet above
mean sea level.

The defendant acquired ownership of a parcel of land
located in Westwood on December 19, 1969. The defend-
ant trust's land abuts Neponset's and is surrounded on
three sides by Willett Pond. Some time in 1970, the trust
submitted to the Westwood planning board a plan show-
ing the land subdivided into nine lots, and the board
endorsed the plan as not requiring approval under the
Subdivision Control Law. In connection with the subdivi-
sion's development the defendant constructed a drainage
pipe running from a private way across lot eight through
a valley to Willett Pond. The drainage pipe as constructed
ultimately receives surface water from some of the other
lots in the development by way of two catch basins locat-
ed in the private way. The natural contour of the land
was changed in the process of constructing the drainage
pipe. The drainage system terminates in a concrete head-
wall located at, or near, the approximate edge of the
pond. The inside bottom of the drainage pipe at this head-
wall has been measured as 140.95 feet above mean sea
level. Since 1913 all of the deeds have referred to, and
established, the boundary lines between the properties of
Neponset and the trust as "the high water mark of Wil-
lett Pond."

1. Neponset first contends that the defendant's pipe
encroaches on its land.[1] Since the boundary between the

---

[1] The parties have spent a considerable amount of effort addressing
the question whether Neponset's claims are barred because of laches.

two parcels has remained fixed since 1913 as "the high water mark of Willett Pond" there is no apparent disagreement between the parties that in order to settle this question the judge needed to determine how the high water mark at the dam site would be fixed, and, once that formula was ascertained, to locate where the mark would fall on the ground between the parcels.

The authority in Massachusetts on how high water is to be determined in an artificial water course or a nontidal stream is sparse. The decision in *Brady* v. *Blackinton*, 113 Mass. 238 (1873), provides a standard for fixing the high water mark of an artificial body of water in these terms[2]: "The 'high water mark' means the highest point to which the dam will raise the water in the ordinary state of the stream." 113 Mass. at 245. The continued vitality of the standard established in this case is seen both by its application (in another context) in *Weinstein* v. *Lake Pearl Park, Inc.*, 347 Mass. 91, 94 (1964), and by the fact that other courts, and at least one commentator on the subject, have defined high water in substantially similar terms. Thus, in *Morrison* v. *First Natl. Bank*, 88 Me. 155, 159 (1895), the Supreme Judicial Court of Maine defined the term "high water mark" when applied to a nontidal river as the highest level reached by the water when the river is unaffected by freshets and contains its natural and usual flow, and in *Belmont* v. *Umpqua Sand & Gravel, Inc.*, 273 Or. 581 (1975), the Oregon Supreme

---

The judge did not expressly rule on this question in her decision. She did, however, grant the trust's request for a ruling of law that the plaintiff was barred by laches. It appears to us that this ruling was inadvertent on the judge's part since she resolved the action on the merits without regard to the applicability of laches. Accordingly, we treat the merits of the controversy apart from the laches issue.

[2] *Brady* v. *Blackinton, supra*, concerned an action brought under the mill acts, G. L. c. 253, §§ 1 et seq., alleging that the defendant's mill dam had overflowed the plaintiff's meadow. To resolve the controversy before the court in that case it was necessary to determine the high water mark of the dam.

Court defined the term as " 'the point to which the water usually rises, in an ordinary season of high water . . . .' " 273 Or. at 590 n.12. Compare Frankel, Seashore Waters and Water Courses; Maine and Massachusetts 46 (1969), and cases cited. Neither party seriously questions the use of these standards to resolve their dispute. But Neponset contends that the judge's interpretation and application of the test to the facts in the case constituted error.

The evidence before the judge as to the placement of the high water mark at the dam site is best characterized as conflicting and confusing. The net result of the proofs was to place the mark in a range between a low of 137.4 feet and a high of 141.48 feet. The judge found as a fact that high water at the dam site was 140.68 feet, the height of the dam's abutments with the flashboards in place. Despite evidence which would have warranted a contrary finding, we do not consider the judge's conclusion to be clearly erroneous. It was supported by evidence that water spilled over the abutments and flashboards at various heights depending on the weather conditions and the season of the year; by evidence that the highest level at which the water could be maintained in the pond without spilling over the abutments was 140.68 feet; and by testimony that the purpose of the dam was to impound the water in the pond, that is, to confine the water in such a way as to create and maintain an artificial reservoir.[3] Especially significant in buttressing the judge's conclusion was evidence that about the time the dam was constructed in 1913 the high water mark at the site of the dam was placed at a point two feet above the flow of its wasteway, or at 137.4 feet. The latter figure was reconciled to comport with the judge's finding of 140.68 feet as noted in the margin.[4] The dam's purpose and the profile

---

[3] One of the plaintiff's experts testified as to the particular purpose of the dam as follows: "The dam impounds water . . . in impounding water the goal of the dam is to keep the water level as high as possible in the dam itself."

[4] The judge found that the difference probably occurred as the result

and plan of the dam at the time it was constructed, cou-
pled with testimony that water was usually maintained
within the pond, barring unusual weather conditions
such as spring freshets, heavy rains or the need to add
water to the river's flow, were significant signposts that
warranted the conclusion that high water at the dam site
was 140.68 feet.

This then left the question whether the perimeter of
the pond would fall between the parcels of the parties
thereby creating the boundary line. On this point the
judge ruled that "it is impossible on the evidence ... to
determine precisely where the boundary line is [and as
a result] the plaintiff has not sustained its burden of
proof that the concrete headwall and pipes encroach" on
its land. This ruling also finds support in the record. Tes-
timony indicated that in the course of construction of the
drainage system within the subdivision fill was added
and the natural contour of the land at, or near, the point
where the parcels abutted was altered. This left Neponset
in a position where it could not depict the natural contour
of the defendant's land (either now or in 1913) in a way
that would support an accurate finding on the point
where the water would fall on the land when the level of
the pond reached 140.68 feet at the dam site. The nebu-
lousness of the proof was illustrated by the testimony of
one of Neponset's experts who made an attempt to locate
the line precisely. The engineer admitted that his method
of measurement was inaccurate and that his placement
of the line was subject to a four-foot margin of error on
either side.[5] In view of the fact that the defendant's drain-

of the use in the profile and earlier plan used to construct the dam of
a base different from the 1929 geodetic survey datum used in the later
plans. Neponset does not contest this finding. There was no evidence
that the dam was not built in accordance with the plans submitted in
1913 to the county commissioners.

[5] Furthermore it appears from the decision that a Land Court engi-
neer attempted to set the line by a comparison of the plans introduced

age pipe, if it trespassed at all, did so only slightly, we cannot say, based on the evidence just summarized and upon a review of the entire record, that the judge's conclusion that the line could not be located with any degree of accuracy without an independent survey was wrong.

2. Neponset also contends that the trust had collected surface waters from its land (and the parcels that the trust had conveyed out) into an artificial channel (the drainage pipe) and caused the water to discharge onto the plaintiff's land. See *Jackman* v. *Arlington Mills*, 137 ·Mass. 277 (1884) (a landowner "has no right to subject the land of another to a servitude of running water to which it is not naturally subject"). 137 Mass. at 283. See also *Manning* v. *Woodlawn Cemetery Corp.*, 245 Mass. 250, 251 (1923); *Fortier* v. *H.P. Hood & Sons*, 307 Mass. 292, 296 (1940); *Miller* v. *Darby*, 336 Mass. 243, 246 (1957); *Chesarone* v. *Pinewood Builders, Inc.*, 345 Mass. 236, 240 (1962); *Tucker* v. *Badoian*, 376 Mass. 907, 913-914 (1978). The trust maintained that the drainage pipe was laid out in a natural watercourse, thereby making the artificial channeling rules inapplicable. See *Fitzgerald* v. *Fortier*, 292 Mass. 268, 273-274 (1935). The judge concluded that "the evidence falls short of establishing a natural watercourse in this location," but she determined that the case was not an appropriate one for injunctive relief. The denial of relief was predicated on a finding that much, if not all, the water coming through the drainage pipe would reach Neponset's land in any event by way of the natural flow of surface water off the trust's land. We also find no error in this conclusion. Testimony indicated that a portion of the trust's land in the area of the pipe was underpinned by ledge which would increase the natural flow of surface water by preventing its absorption and that the existence of the pipe with respect to lot eight where it was located

at the trial by the parties and was unable to do so. This factor also supports the conclusion that the perimeter of the pond could not be located with any degree of accuracy.

did not substantially change the quantity of water that had previously reached the pond. The evidence of the degree of pollution, if any, caused by the water coming through the pipe was inconclusive. Keeping in mind that the trust's land was encompassed on three sides by the pond, the thrust of the evidence was to the effect that the drainage caused by the presence of the pipe was not substantially more than what would flow from the subdivision into the pond in the process of normal runoff. Thus, there may have been an artificial channel but it did not materially increase the flow of water on to Neponset's land. This aspect of the case is governed, in our opinion, by our statement in *McNamara* v. *Westview Bldg. Corp.*, 4 Mass. App. Ct. 670, 672 (1976). "As the flow of surface water onto the plaintiff's land was not materially increased by the defendant's acts, and as it appears that the natural entrance of most, if not all, of the surface drainage from the defendant's land onto the plaintiff's land remained the same as it had been prior to the installation of the drainage system, and that no damage to the plaintiff's land resulted from the change from natural drainage to an artificial drainage system, the plaintiff has no basis for complaint."[6] See also *Kuklinska* v. *Maplewood Homes, Inc.*, 336 Mass. 489, 493-494 (1957); 5 Powell, Real Property pars. 730-731 (Rohan rev. ed. 1977).

*Judgment affirmed.*

---

[6] *Kattor* v. *Sabatini*, 4 Mass. App. Ct. 835 (1976), is inapposite since in that case there was a definite finding that the defendant's artificial channel caused an increased flow of water onto the plaintiff's land, and there was no indication, as here, that a situation existed which would not warrant injunctive relief.