Rockingham
No. 86-448

RUSSELL SEWARD & a.

v.

PATRICK LORANGER & a.

July 8, 1988

*Grinnell & Bureau,* of Derry (*David R. Connell* on the brief and orally), for the plaintiffs.

*Stephen N. Cahill,* of Concord, by brief and orally, for the defendants.

BROCK, C.J. The plaintiffs, Russell and Elaine Seward, appeal from a decision of the Superior Court (*Gray,* J.), denying their petition to quiet title and for injunctive relief in a boundary dispute involving property in the vicinity of Pleasant Lake in Northwood. The trial court, at the same time, granted the petition of the defendants, Patrick and Michele Loranger, for such relief. For the reasons that follow, we reverse and remand.

The dispute between the parties involves land on the east side of a so-called "great pond," Pleasant Lake. Under State law, the State has title to the water and bed of the lake, to the mean natural high water line. RSA 4:40-a (Supp. 1987), 271:20, 482:41-e (Supp. 1987). In the early 1900's, however, a mill erected a dam on the lake. Since then, the presence of the dam has increased the volume of water in the lake, resulting in an artificial water line that is located above the level of the natural high water line and fluctuates seasonally as a consequence of dam operations. The current owner of the dam is the Town of Deerfield.

The dispute between the parties, who own parcels of land to the east of the lake in its artificially expanded state, concerns property located above the natural high water line of the lake. The deeds in the record indicate that the parties' two lots had their origins in a 120-acre tract which Edward Langmaid conveyed to Jackson Philbrick in 1879, prior to the construction of the dam, and which Robert Philbrick conveyed to James and Hazel Steele in 1944, after dam operations had begun. The latter, Philbrick-to-Steele deed (1) stated that the 120-acre property's western boundary was "on the shore" of the lake, (2) stated that the property was "the same premises conveyed" by Langmaid to Jackson C. Philbrick, and (3) reserved "the right to flow the land bordering on said Pleasant Pond." The Steeles thereafter created and sold lots from the 120-acre parcel.

The Sewards purchased their parcel, known as lot 10, from the Steeles in 1961. The deeded Seward lot is to the east of and abuts Camp Road. The deeded westernmost corner of the lot is "at an iron pipe set at high water mark in ground on the East side of the road,"

the "high water mark" being the artificial high water line at that time, and the deed indicates that the lot was "conveyed with a right of way to the lake level." The deed also states that lot 10 was "taken from the Jackson C. Philbrick lot now owned by [the Steeles]," but does not mention the flowage rights that Philbrick reserved in the conveyance to the Steeles.

Shortly after their purchase of lot 10, the Sewards filled a portion of the swampy area extending from the western side of Camp Road to the open water beyond the swamp. The result was a wedge-shaped strip of land that abuts the water for about thirty feet, and is to the west of the deeded Loranger parcel. The Sewards proceeded to occupy and use the strip for access to the lake.

The Lorangers, whose property is to the north of the Seward property and on the other side of Camp Road, purchased the parcel in 1984 from Norman and Ellen Bernard. The deeded Loranger lot originally was part of a larger parcel, known as lot 9, that the Steeles conveyed to Harrington and Alice Smalley in 1954. The Steele-to-Smalley deed described the western boundary as "beginning at an iron pipe set at high water mark . . . thence running in a South Easterly direction one hundred feet (100′) to an iron pipe driven in edge of swamp near El. light pole. . . ." The described "high water mark," again, was the artificial high water line which, at that time, was subject to dam operations by the Pembroke Water Company, and was on the edge of a swamp. As did the Steele-to-Seward conveyance, the Steele-to-Smalley deed stated that the conveyed property was "taken from the Jackson Philbrick lot now owned by [the Steeles]," and was silent on the subject of flowage rights.

In the 1950's, the Smalleys filled a portion of the swampy area to the west of their deeded boundary, in order to create a beach. The aggregate effect of the Smalleys' fill and fill added by the waterfront owner to their north was to shift the artificial high water line farther west, although not as far as the location of the natural high water line. The Smalleys thereafter conveyed lot 9 to their son, Harrington Smalley, Jr., stating in the deed that the conveyed property was "the same premises conveyed to [the Smalleys] by [the Steeles]."

In 1970, the younger Smalley conveyed the southern portion of lot 9 to Eric and Joan Linnell, stating in the deed that the conveyed property was "a part of the premises" conveyed to him by his parents. In contrast to the Steele-to-Smalley deed, the Smalley-to-Linnell deed described a western boundary that coincided with the "high water line," as follows: "Beginning at an iron pipe set at the

high water mark . . . thence running southerly along the high water line of said Lake Fifty feet (50′) to an iron pipe . . . near an electric light pole. . . ." Each of the subsequent deeds for the southern portion of lot 9, including the most recent Bernard-to-Loranger deed, contained the "high water line" description of the western boundary, and stated that the conveyed property was "the same premises" conveyed to the grantor.

The conflict between the parties, which led them to file petitions to quiet title and for injunctive relief, began after the Loranger purchase in 1984, when the Sewards continued to use the filled strip, which included approximately thirty feet of lake frontage, at the same time that the Lorangers sought to use the fifty feet of frontage that they believed was theirs by deed. The Sewards also named the Steeles and the State as defendants. The Steeles defaulted, however, and the State filed a disclaimer of interest in the disputed land under RSA 498:5-c. The Sewards and Lorangers therefore were the only parties present at the consolidated trial of the petitions.

The Sewards asserted title and their consequent right to exclusive possession of the filled strip and accompanying frontage on the basis, alternatively, of (1) their adverse possession against the Steeles, who they contended are the record owners of the filled area, or (2) their purported oral agreement with previous owners of the Loranger lot, whose alleged recognition of the plaintiffs' exclusive possessory right also bound the Lorangers.

The Lorangers, in contrast, claimed title as littoral, or lakefront, owners to a parcel with fifty feet of frontage, including the Sewards' claimed frontage. In addition, they asserted the absence of a writing that confers on the Sewards any shoreline interest other than the right-of-way, and contended that the right-of-way itself is unenforceable because Steele did not own the property over which he purported to grant it. Finally, the defendants argued that the Sewards had failed to establish title to their claimed frontage through adverse possession.

The trial court determined that the Lorangers own the filled property between their deeded western boundary and the current artificial shoreline, including the Sewards' claimed frontage, and granted their request for an injunction to prevent the Sewards from entering or using the property. In reaching its decision, the court first established that the controlling artificial high water line for purposes of its decision would be the one that predominated throughout the seasonal fluctuations. Then, relying on its finding that the Lorangers, by deed, are littoral owners, the court

determined that title to man-made fill vests in littoral owners, much in the way that title to natural accretion vests in riparian owners. Furthermore, in ruling on the boundaries of the Lorangers' property, the court allocated to them a forty-foot frontage reflecting their proportional share of the shoreline as diminished by the fill.

The court found that the Sewards, whose title does not encompass lake frontage, are not littoral owners. The court determined, moreover, that they had failed to establish title to their claimed frontage either through evidence of a legally enforceable written agreement or through adverse possession against the record owners of the southern portion of lot 9. The court also concluded that the Sewards lack even an enforceable right-of-way because their grantors, the Steeles, lacked title to the underlying property.

In this appeal, the plaintiffs assert error, first, in the trial court's determination that the Lorangers own the filled property that encompasses the Sewards' claimed frontage, and, second, in the trial court's refusal to grant the plaintiffs relief on the basis of alleged oral agreements regarding the filled strip. While the trial court addressed the issue of who owns the Smalley-filled property, we find that the issue at the heart of this dispute is who has, and has had, record title to the land lying under the fill that the Smalleys and the Sewards deposited. It is that issue we address now.

As a preliminary matter, we note that a petitioner in a quiet title action must prove good title as against all other interested or potentially interested persons. *See* RSA 498:5-a, :5-b; *Sorenson v. Wilson*, 124 N.H. 751, 757–58, 476 A.2d 244, 247–48 (1984). Furthermore, the interpretation of the deeds in a quiet title dispute is ultimately the province of this court, which will refer to the trial court's findings as to the parties' intentions. *MacKay v. Breault*, 121 N.H. 135, 139, 427 A.2d 1099, 1101 (1981) (citing *Robbins v. Lake Ossipee Village, Inc.*, 118 N.H. 534, 536, 389 A.2d 940, 941 (1978)). The trial court's determination of boundary lines, however, is usually a finding of fact that this court will uphold if the evidence supports it. *Pugliese v. Town of Northwood*, 119 N.H. 743, 749–50, 408 A.2d 113, 117 (1979).

The law is settled that the title to property on the shore of a great pond in its natural state ordinarily extends to the natural high water line. *Whitcher v. State*, 87 N.H. 405, 409, 181 A. 549, 553 (1935). Once a dam commences operations on the lake, however, the title of lakefront owners is subject to a flowage easement, whereby the owner of the dam may submerge land above the

natural high water line to the extent that flowage rights permit. *Id.* at 410–11, 181 A. at 553–54. Furthermore, the dam owner's exercise of flowage rights may, in some circumstances, effect an implicit dedication to the public of both the water and underlying soil above the level of the natural high water line. *See Weinstein v. Lake Pearl Park, Inc.*, 347 Mass. 91, 92–95, 196 N.E.2d 638, 640–41 (1964); *State v. Malmquist*, 114 Vt. 96, 98–102, 40 A.2d 534, 536–38 (1944); *Wilbour v. Gallagher*, 77 Wash. 2d 306, 313–14, 462 P.2d 232, 237 (1969), *cert. denied*, 400 U.S. 878 (1970); *Village of Pewaukee v. Savoy*, 103 Wis. 271, 276–77, 79 N.W. 436, 437–38 (1899). If a trial court were to find that the public has acquired title, through dedication, to the water and underlying soil in an artificially expanded great pond, that title would not be susceptible to defeat through adverse possession by private parties, such as owners of property on the artificial shoreline. *See* RSA 539:6; *see also* RSA 482:41-e (Supp. 1987) (currently prohibiting unauthorized artificial fill in public waters); Laws 1955, ch. 244. Assuming no finding of dedication, however, the acquisition of title through adverse possession would be possible. *See* RSA 508:2; *Barker v. Company*, 78 N.H. 160, 162, 97 A. 749, 751 (1916) (flowage easement will not prevent acquisition of adverse possession title to the land that is subject to the easement).

In holding that the Lorangers, rather than the Sewards, own the frontage that the Sewards claim, the trial court's primary concern was with who is entitled to the filled property as a whole, rather than with the more fundamental issue of who has, or had, title to the formerly submerged land that now lies under the fill. The inappropriate focus consequently diverted the court's attention from the deeds in the Lorangers' chain of title, whose provisions are pertinent to the proper disposition of this quiet title dispute.

Our inspection of the deeds pertaining to the Loranger parcel compels our conclusion that the Steeles received and retained record title to the flowed land above the natural high water line. In incorporating by reference the property description in the pre-flowage Langmaid-to-Jackson Philbrick deed, and in expressly reserving flowage rights, it is clear that what Robert Philbrick conveyed to the Steeles was title to the natural high water line, subject to Philbrick's flowage easement. *See Whitcher v. State*, 87 N.H. at 409–11, 181 A. at 553–54.

Furthermore, when the Steeles conveyed lot 9 to the Smalleys, they did not transfer title to the flowed land. The Steele-to-Smalley deed described a 100-foot western boundary running between two pipes with respective locations at the artificial high water mark

and on the edge of the swamp, and, moreover, did not provide that the conveyed title was subject to a flowage easement. If the Steeles had intended to convey title to the natural high water line, subject to the flowage easement that Robert Philbrick reserved, the Steele-to-Smalley deed would have so indicated, and there would have been no call for the artificial boundary description. We therefore conclude that the western limit of the Smalleys' title was either the artificial high water line, as it existed at the time of the conveyance to the Smalleys, or the pipe-to-pipe line. We leave to the trial court the factual determination of precisely where the deeded western boundary was. *See Pugliese v. Town of Northwood*, 119 N.H. at 749–50, 408 A.2d at 117; *Sheldon v. Sevigny*, 110 N.H. 419, 422, 272 A.2d 134, 136 (1970).

Because we have determined that either the artificial high water line or the pipe-to-pipe line marked the western limit of the title that the Smalleys acquired and therefore could convey, the conclusion follows logically that the same line was controlling in the subsequent conveyances to Harrington Smalley, Jr., and to those persons, including the Lorangers, who succeeded him in title to the southern portion of lot 9. Because each deed in the chain of title for the southern portion of lot 9 incorporated, by reference, the property description contained in the immediately preceding deed by which the grantor acquired title, the Steele-to-Smalley boundary references were an implicit part of the subsequent deeds. The Steeles thus retain record title to the flowed land located between the natural high water line and the deeded western boundary for the southern portion of lot 9.

■ Still, while Steele may have retained record title to the submerged land, it is possible that the filling and possession of the filled property by the Smalleys, together with their successors in interest to the southern portion of lot 9, ripened at some point into title through adverse possession that inures to the Lorangers' benefit. *See Alukonis v. Kashulines*, 96 N.H. 107, 108–09, 70 A.2d 202, 203 (1950) (upholding a finding of title through adverse possession on the basis of tacking of successive adverse possessions); 2 C.J.S. *Adverse Possession* §§ 160, 163, at 879, 884 (1972). One of the requirements of adverse possession, however, is exclusivity, *see Fagan v. Grady*, 101 N.H. 18, 21, 131 A.2d 441, 443 (1957); *Little v. Downing*, 37 N.H. 355, 367 (1858), which the Sewards and other property owners might have undermined if they used the Smalley-filled parcel in common with the Smalleys and subsequent owners of the southern portion of lot 9. *See* 2 C.J.S. *Adverse Possession* § 56, at 729 (use or occupation in common with neighbors, third

persons, or the public is not exclusive possession). Nonetheless, even if the Lorangers were unable to establish title through adverse possession, the evidence might suffice to establish their right to an easement through prescription. *See Smith v. Putnam*, 62 N.H. 369, 372–73 (1882) (evidence of open, continuous and impermissive use for more than twenty years by the plaintiff and plaintiff's grantors was sufficient to establish the plaintiff's right to a prescriptive easement).

Apart from the issue of the Lorangers' interest in the filled area located to the west of their deeded western boundary, there is the issue of what, if any, interest the Sewards have in the filled strip that affords them access to the lake. First, having determined that the Steeles retained record title to the flowed land located between the natural high water line and the Lorangers' deeded western boundary, we conclude, similarly, that the Steeles retained record title to the flowed land over which the Sewards have chosen to exercise their right-of-way. We note next that the right-of-way is a limited right to use property belonging to the Steeles for passage to the lake, *see* 77 C.J.S. *Right*, at 392–93 (1952), and, in the absence of a specified location, entitles the Sewards to only "a reasonably convenient and suitable way across the [Steeles'] land." *Barton's Motel, Inc. v. Saymore Trophy Co.*, 113 N.H. 333, 335–36, 306 A.2d 774, 776 (1973); *cf. Sakansky v. Wein*, 86 N.H. 337, 340, 169 A. 1, 3 (1933) (deeded right-of-way, with definite location, confers an absolute right to exercise the right-of-way in the specified location, whether or not the location is reasonable).

Nonetheless, while the right-of-way confers only a limited right of use, and not title, it is possible that the Sewards have acquired adverse possession title to a portion, if not all, of the filled strip. Of course, to the extent that their exercise of the right-of-way has been consistent with the limited nature of that right, the Sewards' use has been permissive and would defeat a claim of adverse possession, which requires hostile use. *See* 2 C.J.S. *Adverse Possession* §§ 25, 59, 77, at 676, 731, 752. If, however, by depositing fill and occupying the filled strip, the Sewards have exceeded the scope of use that the right-of-way permits, their use might satisfy the element of hostility.

■ Because the trial court did not address the issues of adverse possession, as framed and discussed above, we reverse and remand for proceedings and rulings consistent with this opinion, including the submission of additional evidence and the participation of other interested or potentially interested parties such as the Steeles. We would observe, with regard to the record, that our consideration

of this appeal has been hindered by the absence of a map that clearly depicts the parties' conflicting claims. We therefore request the trial court to facilitate any further consideration that may be necessary on appeal, by appending to its decision a graphic depiction of the conflicting claims, as well as the court's boundary determination.

In view of our conclusion above, we need not discuss the merits of the legal theory by which the trial court determined title. We note, however, our reservation regarding the court's characterization of man-made fill as artificial accretion to which littoral owners are entitled. The court's theory minimizes the difference between natural accretion along riverbanks and man-made fill along lakefronts, and in so doing overlooks the purpose of the natural accretion rule, which makes inappropriate its application by analogy in this case. *See* III AMERICAN LAW OF PROPERTY §§ 15.26–.29 (1952).

*Reversed and remanded.*

All concurred.